# Slip Op. 01-115

# UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————————————
                       :

GEUM POONG CORPORATION          :
and SAM YOUNG SYNTHETICS CO., LTD.,  :
                       :

        Plaintiffs,           :
                       :

        v.               :
                       :    Consolidated
                       :    Court No. 00-06-00298

THE UNITED STATES,            :
                       :

        Defendant,         :
                       :

        v.               :
                       :

E.I. DUPONT DE NEMOURS, INC.;    :
ARTEVA SPECIALTIES S.a.r.l.,      :
d/b/a KoSa; and WELLMAN, INC.,     :
                       :

        Defendant-Intervenors.   :

———————————————————————————:

[ITA's antidumping duty determination remanded.]


                                 Dated: September 6, 2001

Sandler, Travis & Rosenberg, P.A. (Philip S. Gallas and Mark R. Ludwikowski) for plaintiffs.

Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Erin E. Powell), Scott D. McBride, Office of the General Counsel, United States Department of Commerce, of counsel, for defendant.

Collier Shannon Scott, PLLC (Paul C. Rosenthal, Kathleen W. Cannon, David C. Smith, Jr., and Grace W. Kim) for defendant-intervenors.

## OPINION

**RESTANI, Judge:**

This matter is before the court on motions for judgment based upon the agency record pursuant to USCIT Rule 56.2. The motions have been brought by certain respondents in an antidumping investigation, Geum Poong Corporation and Sam Young Synthetics Co., Ltd. (respectively, "Geum Poong" and "Sam Young"; collectively "Respondents" ), and petitioners on behalf of the domestic industry in the antidumping investigation, E.I. DuPont de Nemours, Inc.; Arteva Specialties S.a.r.l., d/b/a KoSa; and Wellman, Inc. (collectively "Petitioners"). The parties challenge aspects of the final affirmative determination of the Department of Commerce ("Commerce") in Certain Polyester Staple Fiber from the Republic of Korea, 65 Fed. Reg. 16,880, as amended, 65 Fed. Reg. 33,807 (Dep't Comm. 2000) ["Final Determination"]. Respondents and Petitioners both challenge Commerce's calculation of Geum Poong's constructed value ("CV") profit ratio using "facts available" under 19 U.S.C. § 1677b(e)(2)(B)(iii). Respondents also contend that Commerce erred in calculating Sam Young's cost of production ("COP") by relying on reported cost of merchandise ("COM") data that were not co-extensive with the period of investigation ("POI").

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994). The court will uphold the Commerce's determination in antidumping investigations unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## FACTUAL & PROCEDURAL BACKGROUND

On April 2, 1999, Petitioners filed an antidumping duty petition with Commerce covering

certain polyester staple fiber from Korea and Taiwan.  On April 29, 1999, Commerce initiated

antidumping duty investigations against Geum Poong, Sam Young, and Samyang Corporation

("Samyang").  Certain Polyester Staple Fiber from the Republic of Korea and Taiwan, 64 Fed.

Reg. 23,053 (Dep't Comm. 1999) (init. of investigation).  The POI covered April 1, 1998 to

March 31, 1999.

On November 8, 1999, Commerce published its preliminary affirmative antidumping

duty determination.[1]  Certain Polyester Staple Fiber from the Republic of Korea and Taiwan, 64

Fed. Reg. 60,776 (Dep't Comm. 1999) (prelim. determ.).  Commerce based normal value ("NV")

for Geum Poong on constructed value because Geum Poong lacked a viable home market for

comparison with sales in the United States.[2]  Id. at 60,782.  Commerce calculated Geum Poong's

CV profit and CV selling expenses by taking a weighted average of the selling expenses incurred

and profit earned by Samyang and Sam Young.[3]  Id.

---

[1]  Commerce assigned Samyang, Sam Young, and Geum Poong preliminary dumping margins of 3.51, 6.33, and 26.39 percent, respectively.

[2] Commerce calculates constructed value based on the sum of the following:  cost of materials and fabrication for the foreign like product; selling, general and administrative (SG&A) expenses; profit; and U.S. packing costs.  19 U.S.C. § 1677b(e).

[3] Where actual data are not available to determine CV profit under 19 U.S.C. § 1677b(e)(2)(A), section 1677b(e)(2)(B) provides three alternatives:

(i) [Alternative One] the actual amounts incurred and realized by the specific exporter or producer  . . . for profits, in connection with the production and sale, for consuming in the foreign country, of merchandise that is in the same general category of products as the subject merchandise;

On January 5, 2000, Geum Poong submitted an alternative CV profit calculation methodology using third country data. On January 11, 2000, Commerce rejected the submission as untimely filed, and on the same date, solicited from Respondents and Petitioners additional information regarding the appropriate methodology for calculating Geum Poong's CV profit ratio. In response, Geum Poong submitted certain pages from a Bank of Korea ("BOK") publication entitled "Financial Statement Analysis for 1998" that included the country-wide profit ratio for the Korean man-made fibers industry. See Geum Poong Letter to Commerce (Feb. 8, 2000), at Exh. A, P.R. Doc. 258, Respondents' App., Tab 9, at Exh. A.

On March 30, 2000, Commerce published its final affirmative antidumping duty determination. See Final Determination, 65 Fed. Reg. 16,880. In the final determination, Commerce calculated Geum Poong's CV profit by taking a simple average of the BOK profit data and the figure for the weighted average profit ratios of Samyang and Sam Young. Commerce arrived at the following dumping margins: 0.14% for Samyang (*de minimis*); 7.96 Sam Young; and 14.10% for Geum Poong.

---

(ii) [Alternative Two] the weighted-average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) . . . for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(iii) [Alternative Three] . . . any other reasonable method except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise [.]

**DISCUSSION**

**I. Calculation of CV Profit for Geum Poong**

A.  Selection of Alternative Three

Petitioners contend that Commerce erred in calculating Geum Poong's CV profit under Alternative Three on the ground that verified profit data for Sam Young and Samyang were available, thereby requiring calculation under Alternative Two and obviating the need to factor in the BOK profit data.[4]  Petitioners' argument lacks merit for two reasons.

First, Petitioners' argument rests on the faulty assumption that Commerce may resort to Alternative Three only when data are unavailable to calculate CV profit under the other two Alternatives.  The three Alternatives are not hierarchical.  See Statement of Administrative Action, accompanying H.R. Rep. No. 103-826(I), at 840 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4176 (1994) [hereinafter "SAA"].  Petitioners quote language from the SAA purportedly limiting the selection of Alternative Three to cases where "no other data are available."  Petitioners seem to equate the selection of Alternative Three with a decision to resort to "facts available."  The language quoted clearly describes the circumstance under which Commerce may calculate CV profit under Alternative Three *without applying the profit cap*, that is, under "facts available":

> The Administration . . . recognizes that where, due to the absence of data, Commerce cannot determine amounts for profit under alternatives (1) and

_____

[4] The SAA specifies that "Commerce will explain the basis for the selection of a particular methodology [of calculating CV profit] in a given case."  SAA at 840, reprinted in 1994 U.S.C.C.A.N. at 4176.  Commerce explained why Geum Poong's CV profit could not be calculated under § 1667b(e)(2)(A) (subject merchandise actual data for the specific exporter) or under Alternative One (general product category data for specific exporter).  Neither of these findings are in dispute.

(2) or a "profit cap" under alternative (3), it might have to apply alternative (3) on the basis of "the facts available."  This ensures that Commerce can use alternative (3) when it cannot calculate the profit normally realized by other companies on sales of the same general category of products.

SAA at 841, reprinted in 1994 U.S.C.C.A.N. at 4177.

Second, Commerce did not state, as Petitioners assert, that it lacked profit data for Samyang and Sam Young; rather, it explained that it could not use Alternative Two under the following reasoning:

Samyang is the only respondent with viable home market sales (19 C.F.R. § 351.405(b)(2) requires a profit ratio under the alternative be based on home market sales).  If we were to use Samyang's profit ratio exclusively under this alternative, Geum Poong would be able to determine Samyang's proprietary profit rate [in violation of 19 C.F.R. 351.306(a)].[5]

Issues & Decision Mem. to Final Determination, 65 Fed. Reg. 16,880, at cmt. 15.  [hereinafter "Issues Mem."].  Commerce is correct that Alternative Two cannot be based on home market sales in this case.  Alternative Two is limited to profits incurred and realized "in connection with

---

[5]  19 C.F.R. § 351.306 provides, in relevant part, as follows:

Use of business proprietary information.

(a) By the Secretary. The Secretary may disclose business proprietary information submitted to the Secretary only to:

(1) An authorized applicant;
(2) An employee of the Department of Commerce or the International Trade Commission directly involved in the proceeding in which the information is submitted;
(3) An employee of the Customs Service directly involved in conducting a fraud investigation relating to an antidumping or countervailing duty proceeding;
(4) The U.S. Trade Representative as provided by 19 U.S.C. 3571(i)
(5) Any person to whom the submitting person specifically authorizes disclosure in writing; and
(6) A charged party or counsel for the charged party under 19 C.F.R. part 354.

the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country." 19 U.S.C. § 1677b(e)(2)(B)(ii). The regulations specify that under 19 U.S.C. § 1677b(e)(2)(B), "foreign country" generally means "the country in which the merchandise is produced." 19 C.F.R. 351.405(b).[6] A regulation promulgated by an agency with rule-making authority in a particular area and reasonably interpreting an ambiguous statute, such as Alternative Two, is entitled to deference under Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984). See United States v. Haggar Apparel Co., 526 U.S. 380 (1999). Commerce thus appropriately concluded that any calculation under Alternative Two would be based solely on Samyang's sales data. Because calculating CV profit under Alternative Two, without the Sam Young data, would result in a CV profit ratio that impermissibly revealed Samyang's proprietary profit ratio, Commerce properly determined that Alternative Two was unavailable.

B. Calculation of CV Profit under Alternative Three

To calculate Geum Poong's CV profit, Commerce took a simple average of the BOK data, which may include U.S. sales data, with the figure for the weighted-average profit rates of Samyang and Sam Young. Petitioners contend that under Alternative Three, Commerce is prohibited from relying on profit data derived from non-home market sales and thus erred in factoring the BOK data into its calculation. Commerce responds that it is not barred from relying on non-home market sales data to determine CV profit based on "facts available."

---

[6] In contrast, under 19 U.S.C. § 1677b(e)(2)(A), "foreign country" means the country in which the merchandise is produced or a third country selected by the Secretary under 19 C.F.R. § 351.404(e), as appropriate. 19 C.F.R. § 351.405(b).

Respondents, on the other hand, challenge Commerce's calculation on the following

grounds: (1) Commerce committed ministerial error because the BOK data already included

Samyang's profit rate; and (2) Commerce erred in not applying the BOK data as a "profit cap."

Commerce responds that (1) its calculation constituted a methodological choice; and (2) it need

not have applied the BOK data to determine a profit cap because the statute specifies that the

profit cap is to be derived from home market sales only.[7]

1. Calculation under Facts Available

The statute provides that under Alternative Three, Commerce may calculate CV profit by

"any . . . reasonable method, *except that the amount allowed for profit may not exceed the*

*amount normally realized by exporters or producers (other than the exporter or producer*

*described in clause (i)) in connection with the sale, for consumption in the foreign country, of*

*merchandise that is in the same general category of products as the subject merchandise* [.]" 19

U.S.C. § 1677b(e)(2)(B)(iii) (emphasis added).   Petitioners assert that the language following

the parenthetical refers back to "any reasonable method," and thus the phrase "for consumption

in the foreign country" limits Commerce to data based on home market sales, given the definition

of "foreign country" in the regulations.  Because the BOK data may be based in part on non-

home market sales, Petitioners assert, Commerce may not rely on it.[8]

---

[7] Commerce also argues that in failing to raise the "profit cap" issue below, Respondents
have not exhausted their administrative remedies.  The court finds, however, that Respondents
raised the issue at the administrative level.  <u>See</u>, <u>e.g.</u>, <u>Sam Young and Geum Poong Case Brief</u>
(Feb. 22, 2000) at 27 n.46 and 29 n.51, C.R. Doc. 355, DOC App., Tab 5, at 4 n.46 and 6 n.51.

[8] DuPont cites <u>Shop Towels from Bangladesh</u>, 61 Fed. Reg. 55,957, 55,959 (Dep't
Comm. 1996) (final admin. rev.), for the proposition that Commerce may not rely on data that
includes U.S. sales.  There, Commerce preliminarily calculated CV profit under Alternative
Three using "facts available" based *solely* on U.S. sales.  Commerce stated, "We agree with the

Petitioners' reading of the statute is incorrect. The portion of Alternative Three emphasized above is referred to as the "profit cap." See, e.g., Floral Trade Council v. United States, 41 F. Supp. 2d 319, 326-27 (Ct. Int'l Trade 1999). The SAA clarifies that the home-market limitation does not apply generally to "any reasonable method" provided for under Alternative Three, but to the profit cap ordinarily placed thereon: "[Commerce may calculate CV profit by] any other reasonable method, provided that the amount for profit does not exceed the profit normally realized by other companies *on home market sales* of the same general category of products (the so-called profit cap)." SAA at 840, reprinted in 1994 U.S.C.C.A.N. at 4176 (emphasis added). Otherwise, a case may arise in which Commerce would have *no* means of calculating CV profit, a scenario that clearly could not have been intended by the drafters of the statute.

Petitioners attempt to find support for its reading by pointing to the Department's preamble to the final regulations: "the proposed average industry-wide profit figure presumably would include sales by all exporters and producers in all markets, including sales by the exporter and producer in question and sales to the United States. In our view, the statute prohibits the use of such sales for this purpose." Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,360 (Dep't Comm. 1997) (final rule). Petitioners take the language of the preamble

---

respondents that it is inappropriate to calculate profit for addition to CV based on the respondents' U.S. sales. The statute is clear that we must derive profit on the basis of home market or third-country sales." Id. Commerce therefore changed its profit calculation by relying on actual profits data derived from financial statements of three exporters in the same general category. Commerce in Shop Towels from Bangladesh did not address the present scenario: reliance on data that includes home-market and non-home market sales, but it does stand for the proposition that even in applying "facts available," Commerce complies with the otherwise applicable statutory provisions, to the extent possible.

and the language of Alternative Three with respect to "the foreign country" out of context. It is clear that this limitation refers to the "profit cap," and not to "any other reasonable method."[9]

Thus, Commerce in calculating CV profit under a facts available methodology that employs Alternative Three without the profit cap may rely on any data available to it, which may include some non-home market sales data, provided its method is reasonable and it provides an adequate explanation thereof.

### 2. Geum Poong's CV Selling Expenses

To further bolster their claim, Petitioners allege an inconsistency between Commerce's calculation of CV profit and CV selling expenses. In contrast to Commerce's calculation for CV profit, the calculation for CV selling expenses did not include the BOK data. Petitioners argue that use of Samyang and Sam Young's weighted average to calculate sales expenses under Alternative Two is inconsistent with Commerce's justification for not applying Alternative Two to calculate Geum Poong's CV profit. Petitioners claim that the concern of revealing Samyang's

---

[9] Petitioners' reliance on Floral Trade Council, 41 F. Supp. 2d at 327, is misplaced. The court in Floral Trade Council stated that

> [U]nlike the preferred methodology and alternative (ii), however, alternatives (i) and (iii) do not require the amount for profit to be calculated based on home country sales of a foreign like product in the ordinary course of trade. See 19 U.S.C. §§ 1677b(e)(2)(B)(i) & (iii). Instead, alternatives (i) and (iii) simply require that the calculation for profit be based on home country sales of "merchandise in the same general category of products as the subject merchandise."

Id. The court was discussing the ordinary course of trade requirement and not the meaning or placement of the words "the foreign country."

proprietary data to Geum Poong is still present in the calculation of selling expenses under

Alternative Two.[10]

Petitioners incorrectly assume that Commerce calculated CV selling expenses under

Alternative Two.  In the Preliminary Determination, Commerce specifically indicated that it

calculated Geum Poong's selling expenses under Alternative Three.  Preliminary Determination,

64 Fed. Reg. at 60,782.  Commerce then indicated that it "calculated weighted average amounts

for selling expenses . . .  based on the selling expenses incurred . . . by Samyang and Sam Young

in their respective comparison markets on sales in the ordinary course of trade."  Id.  Commerce

did not change its method of calculating selling expenses for the purposes of the Final

Determination.  See Final Determination, 65 Fed. Reg. at 16, 881.  Thus, Commerce properly

calculated selling expenses according to "any reasonable method" without limitation as to

whether the underlying data had been derived from home market or non-home market sales.[11]

### 3.  Ministerial Error

Respondents allege that Commerce abused its discretion in refusing to correct a

ministerial error of "duplication" where Commerce had "double-counted" Samyang's profit data.

[10] Alternative Two contains "the foreign country" limiting language for the base calculation.  Thus, as with the profit cap, home country sales data are to be used.  Although Samyang's sales expense information derived from home-market sales, data for Sam Young included sales in its largest third-country market, Canada.  Thus, calculation of Geum Poong's CV selling expenses under Alternative Two would rely solely on data for Samyang, thereby impermissibly revealing its proprietary information to Geum Poong.

[11] The parties point to nothing in the statute or applicable regulation that requires Commerce to use the same set of data or sources for calculating selling expenses and profit.  In previous determinations, Commerce has based its calculations on different sets of data.  See, e.g., Certain Fresh Cut Flowers from Colombia, 63 Fed. Reg. 31,724, 31,731 (Dep't Comm. 1998) (final admin. rev.) (basing selling expenses on respondent's home market sales while basing profit on financial statements from a producer of the same general category of goods).

Respondents maintain that Commerce accounted for Samyang's profit first as a component of the

BOK data (which included data on public audited companies such as Samyang), and then again

by using the CV weighted-average profit rate calculated based on Samyang's and Sam Young's

reported comparison market sales. Geum Poong misconstrues the meaning of "ministerial error."

The regulation defines "ministerial error" as "[1] an error in addition, subtraction, or other

arithmetic function, [2] clerical error resulting from inaccurate copying, duplication, or the like,

and [3] any other similar type of unintentional error which the Secretary considers ministerial."

19 C.F.R. § 351.224(f). The term "duplication" falls within the general category of "clerical

error," and the third clause makes clear that intentional choices by Commerce fall outside the

purview of the regulation.

In this case, Commerce clearly made a methodological decision based on facts available,

rather than an inadvertent clerical error. In a letter responding to Geum Poong's letter alleging

ministerial error, Letter from Sandler, Travis & Rosenberg, P.A. to Secretary of Commerce (Apr.

5, 2000), P.R. Doc. 303, Respondents' App., Tab 17, Commerce explained its decision as

follows:

> As Geum Poong does not dispute, the Department intentionally used a simple
> average of the BOK profit rate and the profit rates of Samyang and Sam Young
> to derive Geum Poong's profit. At the final determination, because we did not
> know which companies were included in the BOK data or the relative size of
> their sales[,] we were unable to calculate a weighted average profit rate or to
> make respondent-specific adjustments to the BOK data and, thus, we used a
> simple average as facts available.

Clerical Error Allegations (Apr. 26, 2000), at 4, P.R. Doc. 311, Respondents' App., Tab 18, at 4.

Commerce thus indicated its preferred method if the BOK data had been available in a suitably

disaggregated form, and stated that as a substitute it was relying on a simple average based on the

information in the record. Commerce did not mistakenly input the same set of data twice or

overlook data relied upon in a standard methodology, the types of errors contemplated in the

regulation. Cf. Fabrique de Fer de Charleroi, S.A. v. United States, No. 99-04-00219, slip op.

01-68, at 24-26 (Ct. Int'l Trade June 6, 2001) (finding error to be ministerial where Commerce

failed to include grants within calculation of subsidies, contrary to intended methodology). Thus,

there is no ministerial error. This is not to say, however, that Commerce met its burden of

explaining its methodology or that its methodology is necessarily reasonable.

### 4. Profit cap

Respondents assert that Commerce erred in resorting to "facts available" because the

BOK data provided the profit cap amount "normally realized by exporters or producers" as

required in Alternative Three, and were "publicly available, credible and self-verifying" as

required by Commerce's January 11, 2000 request for additional information.[12] Commerce

responds that the BOK data cannot serve to measure the profit cap, not because the reliability of

the data is suspect, but because the profit cap must be based on home market sales.

Because Commerce is correct that under the statute it is inappropriate to derive the profit

cap from non-home market sales figures, see supra, Commerce is not required to rely on the

undifferentiated BOK data for this purpose, if it has another rational approach available.

Nevertheless, Commerce failed to meet its burden of fully explaining in the final determination

its reasons for resorting to "facts available" or for its facts available selections. After giving its

---

[12] Commerce requested "any publicly available information establishing alternative CV profit ratios for Geum Poong." Letter from Susan H. Kuhbach (Jan 11, 2000), P. R. Doc. 247, Respondents' App., Tab 8. Commerce indicated that "[a]ny information submitted must be credible and self-verifying, e.g., audited financial statements of Korean firms that produce merchandise in the same general category as subject merchandise." Id.

reasons for calculating Geum Poong's CV profit under Alternative Three, Commerce cited the

"profit cap" language therein.  Without explaining why it was unable to calculate the profit cap in

this case, Commerce stated:

> We have based the profit amount for Geum Poong on facts available under section
> 776(a)(1) of the Act.  Lacking any other information to determine an appropriate profit
> rate for Geum Poong, we find that a simple average of the BOK profit rate, and the profit
> rates of Samyang and Sam Young is a reasonable methodology for estimating the profit
> experience of producers in the same general category of merchandise.

Issues Mem., at cmt. 15.

Commerce bears a burden of explaining its method if it chooses to calculate CV profit

under Alternative Three.  The SAA specifies that "[i]f [Alternative Three] is selected, Commerce

will provide to interested parties *a description of the method chosen and an explanation of why it*

*was selected*."  SAA at 841, reprinted in 1994 U.S.C.C.A.N. at 4176 (emphasis added).  If

Commerce must explain itself when it follows Alternative Three, inherently, a clear explanation

is required if Commerce dispenses altogether with the profit cap limitation contained in

Alternative Three.[13]  Commerce does not explain whether any other data were available to

calculate the profit cap.[14]  Nor does Commerce explain why the BOK data do not provide an

adequate facts available profit cap.  If Alternative Three without the profit cap may be used as

---

[13] Commerce states in its brief that "[i]n exercising its discretion, Commerce reasonably
determined that the BOK data did not adequately represent . . . an industry standard [to determine
the applicable profit cap]." DOC Br. Opp. Geum Poong, at 15.  Nowhere in the Final
Determination is there such a discussion.

[14] In response to Commerce's January 11, 2000 request for additional information, Geum
Poong submitted audited financial statements for Samyang, Saehan Industries, Inc., and SK
Chemicals Co., Ltd.  See Geum Poong Letter to Commerce, at Exhs. B-D, P.R. Doc. 258.  From
these statements, Geum Poong calculated the following profit ratios:  0.67% for Samyang, 1.2%
for Saehan, and 1.9% for SK Chemicals.  See id. at 6-7 & nn.2-4.  Commerce made no mention
of the existence of the financial statements, or of the accuracy of Geum Poong's calculations.

"facts available," it would seem a "facts available" profit cap may also be used. The SAA, while approving Commerce's "no profit cap" methodology for cases where no cap data is available at all, see supra pp. 5-6, provides no guidance in the case of a technically deficient cap. Thus, Commerce is free to employ a reasonable approach. Commerce must explain why it chose one methodology over another. Because the statute mandates the application of a profit cap, Commerce cannot sidestep the requirement without giving adequate explanation even in a facts available scenario. Such an omission prevents any meaningful review of Commerce's determination.

          5. Reasonableness of Commerce's Method

          Even assuming the profit cap need not be applied in this case, Commerce failed to explain adequately the reasonableness of its methodology. Commerce's explanation of its methodology is as follows:

> This methodology not only takes into account the profit rates of Samyang and
> Sam Young, which compromise a substantial portion of the industry, but also
> includes, within the BOK rate, rates for other PSF producers such as Saehan
> Industries and SK Chemicals on the same general category of products.

Issues Mem., at cmt. 15. First, in Commerce's brief, the agency acknowledges that "the use of the BOK and Samyang data might have led to the indirect use of the same information twice in the profit calculation." DOC Br. Opp. Geum Poong, at 25. Even if the information from the BOK Financial Statement Analysis in the form made available to Commece did not disaggregate the data by company, Commerce cannot ignore the high likelihood that Samyang and/or Sam Young were included therein, and if they are a substantial portion of the industry, that the BOK rate may not actually represent "other" producers. The probability of double-counting and

whether such double-counting would or would not skew the results were not accounted for in Commerce's explanation.  Second, Commerce does not explain why it is reasonable to take a simple average of company-specific data with industry-wide data when the former is limited to one product-type and the latter includes all man-made fibers.  None of the previous determinations cited by Commerce have utilized such a methodology.   Third, Commerce's justification for using the BOK data (i.e., that it includes data for Saehan Industries and SK Chemicals) is inconsistent with its contention that it was unaware of which companies were included in the BOK data.

Dumping margins are to be determined "as accurately as possible."  NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (citation omitted).  If Commerce, based on substantial evidence, found the use of a weighted average of Samyang and Sam Young data an unrepresentative approximation of Geum Poong's profit, it was within its discretion to seek more information from the parties or to rely on other information it possessed.  That Commerce may need to rely on facts available does not translate to the inherent reasonableness of the method used.

## II.  Calculation of Production Costs for Sam Young

In its questionnaire response, Sam Young indicated that in order to calculate cost of production to cover the full POI (i.e., April 1, 1998 to March 31, 1999), it took costs from its 1998 financial statement (January through December 1998, Sam Young's fiscal year), excluded the first three months of 1998, and added the first three months of extracted 1999 data.  See Sam Young Section D Questionnaire Response (Sept. 9, 1999), at 17-18, P. R. Doc. 164,

Respondents' App., Tab 12, at 17-18.  Respondents claim that in calculating Sam Young's

production costs, Commerce erred by finding Sam Young's reported costs were understated and

relying on figures from Sam Young's 1998 financial statement rather than the POI-based figures

provided by Sam Young.  Issues Mem., at cmt. 13.  Respondents contend that the POI-based

figures were verified and Sam Young was never afforded the opportunity to correct any potential

deficiencies.  The court finds that Commerce acted within its discretion in relying on Sam

Young's fiscal year cost data as facts available.[15]

Commerce has the authority to use facts available in making its determination "if . . .

necessary information is not available on the record."  19 U.S.C. § 1677e(a)(1).   In Commerce's

February 15, 2000 verification report for Sam Young, Commerce noted -- and Respondents do

not deny --  that Sam Young did not keep an inventory ledger of raw materials, thereby

precluding Commerce from determining raw material consumption concurrent with the POI.[16]

Sam Young Verification Report, at II-3, Respondents' App., Tab 13, at 17.  Sam Young's

methodology rested on the apparently flawed assumption that purchases were equal to

---

[15] Relying on Mannesmannrohren-Werke AG v. United States, 77 F. Supp. 2d 1302, 1313-14 (Ct. Int'l Trade 1999), Respondents assert that Commerce's finding is not supported by substantial evidence because it failed to explain why Sam Young has failed to act to the best of its ability.  Such reliance is misplaced where Commerce in this case did not decide to apply *adverse* facts available, but relied on the only reliable data available, given Sam Young's accounting practices.

[16] Sam Young officials stated at verification that Sam Young's direct material costs mostly consist of the raw material costs for polyester waste.  Sales and Cost Verification of Sam Young (Feb. 15, 2000), P.R. Doc. 260, at II-3, Respondents' App., Tab 13, at 17 ["Verification Report"].

consumption during the first quarters of 1998 and 1999.[17]  Issues Mem., at cmt. 13.  Accordingly,

Commerce reasoned as follows:

> [W]e do not believe that the reported costs reasonably reflect and accurately
> capture all of the actual costs incurred in producing the subject merchandise,
> especially with regard to the first quarter of 1999.  For this period, **the amounts
> produced could not have been achieved with the inputs that were purchased
> in that period**. . . . [I]n making our final determination, we have used Sam
> Young's 1998 fiscal year costs of manufacture data as non adverse facts available
> for calculating Sam Young's cost of production because Sam Young's records do
> not allow for an accurate calculation of its POI costs.

Id. (emphasis added).  Respondents have not offered evidence that would controvert Commerce's

conclusion that the input purchases Sam Young reported did not correspond to production totals.

Nor is there support for Respondents' contention that Sam Young was not on notice of

the discrepancy.  In the Preliminary Determination Calculations for Sam Young (Oct. 29, 1999),

at 2, P.R. Doc. 216, DOC App., Tab 3, at 2, Commerce took note that the average cost of

manufacturing ("COM") for the POI is approximately 30% less than a COM based on Sam

Young's financial statement (January-December 1998).  Commerce also noted Sam Young's

contention that because the first three months of its 1998 financial statements came at the tail end

of the Korean foreign exchange crisis, its costs were higher in this period than in the

corresponding period in 1999.  Commerce determined, however, that Sam Young's explanation

"only partially accounts" for the discrepancy noted by petitioners.  Id. at 2-3, DOC App., Tab 3,

at 2-3.  For the purposes of the preliminary determination, Commerce revised the reported per

unit total materials costs to account for what it deemed an apparent discrepancy in the total

---

[17] Sam Young subtracted its first quarter 1998 raw materials *purchases* from its fiscal year 1998 raw materials *consumption* and added its first quarter 1999 purchases to arrive at total reported costs.  See Issues Mem., at  cmt. 13 (citing Verification Report at II-2 and II-3).

production quantity used by Sam Young to calculate its per-unit costs.  See Preliminary

Determination, 64 Fed. Reg. at 60,781.

Respondents assert that at verification Commerce "confirmed and accepted" Sam

Young's cost reporting methodology.  Respondents' Brief at 33.  Respondents wrongly imply

that Commerce's verification of Sam Young's underlying cost data is tantamount to approval of

Sam Young's methodology.  This is not the case.  Commerce, as a preliminary matter, merely

described Sam Young's methodology without passing on its reliability.  The verification report

states in relevant part:

> In order to report the material costs for the POI, officials explained that they
> added the total materials purchased from January through March 31, 1999 to the
> total costs for 1998.  The total materials purchased from January through March
> 31, 1998 were then subtracted to get the total costs for the POI. . . . Company
> officials explained that total production quantity was based on inventory ledger
> entries of finished products.  Company officials provided worksheets showing the
> total monthly production quantities of PSF from February 1998 through May 1999
> . . . .  We selected total monthly production quantities of siliconized PSF and tied
> the quantities to the inventory ledger and to the reported amount . . . .  We noted
> no discrepancies."

Verification Report, at II-2 to II-3, Respondents' App., Tab 13, at 16-17.  The notation of "no

discrepancies" refers to the verification of reported production quantities in comparison with the

corresponding amounts in the inventory ledger.  The verification report makes no mention of the

nexus between the production quantities and cost of inputs actually consumed.

Thus, because necessary information was unobtainable due to Sam Young's accounting

practices, Commerce properly relied on non-adverse facts available.

## Conclusion

Accordingly, the Final Determination is remanded for the purpose of reconsidering Geum Poong's CV profit calculation.  Commerce's determinations with respect to Sam Young's Cost of Manufacturing and Geum Poong's CV selling expenses are sustained.

 

_____
Jane A. Restani
Judge

DATED:  New York, New York

This 6th day of September, 2001