**Slip Op. 02-26**

# UNITED STATES COURT OF INTERNATIONAL TRADE

GEUM POONG CORPORATION
and SAM YOUNG SYNTHETICS CO., LTD.,

        Plaintiffs,

        v.

THE UNITED STATES,

        Defendant,

        v.

E.I. DUPONT DE NEMOURS, INC.;
ARTEVA SPECIALTIES S.a.r.l.,
d/b/a KoSa; and WELLMAN, INC.,

        Defendant-Intervenors.

Consolidated
Court No. 00-06-00298

[ITA's antidumping duty remand determination remanded.]

Dated: March 8, 2002

Sandler, Travis & Rosenberg, P.A. (Philip S. Gallas and Mark R. Ludwikowski) for plaintiffs.

Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Erin E. Powell), Scott D. McBride, Office of the General Counsel, United States Department of Commerce, of counsel, for defendant.

Collier Shannon Scott, PLLC (Paul C. Rosenthal, Kathleen W. Cannon, David C. Smith, Jr., and Grace W. Kim) for defendant-intervenors.

**OPINION**

**RESTANI, Judge:**

This matter comes before the court as a result of the court's decision in Geum Poong

Corp. v. United States, 163 F. Supp. 2d 669 (Ct. Int'l Trade 2001) [hereinafter, "Geum Poong

I"], in which Certain Polyester Staple Fiber from the Republic of Korea and Taiwan, 65 Fed.

Reg. 16,880 (2000), amd'd, 65 Fed. Reg. 33,807 (Dep't Comm. 2000) (final determ.)

[hereinafter, "Final Determination"], was remanded for Commerce to reconsider Geum Poong's

CV profit calculation.  The court now reviews Commerce's Final Results of Redetermination

Pursuant to Court Remand (2001) [hereinafter, "Remand Determination"].

**JURISDICTION**

The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994), which provides

for judicial review of a final determination by the Department of Commerce in accordance with

the provisions of 19 U.S.C. § 1516a(a)(2)(B)(i) (1994).

**DISCUSSION**

In the Final Determination, Commerce calculated Geum Poong's CV profit under 19

U.S.C. § 1677b(e)(B)(iii) ("Alternative Three")[1] by taking a simple average of (A) profit data on

the Korean man-made fiber industry from the Bank of Korea (the "BOK data") with (B) the

---

[1] Under Alternative Three, Commerce may calculate CV profit by "any . . . reasonable method, *except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise* [.]"  19 U.S.C. § 1677b(e)(2)(B)(iii) (emphasis added). The emphasized portion of Alternative Three is referred to as the "profit cap."  See Floral Trade Council v. United States, 41 F. Supp. 2d 319, 326-27 (Ct. Int'l Trade 1999).

figure for the weighted-average profit rates of Samyang and Sam Young, the other respondents in

the investigation.  In Geum Poong I, the court held that Commerce did not err in choosing to

calculate CV profit under Alternative Three on the grounds that:  (1) the Alternatives in 19

U.S.C. § 1677b(e)(B) are not hierarchical; and (2) Commerce could not use Alternative Two

without violating limitations on use of proprietary business information.  The court nevertheless

found that Commerce failed to meet its burden of explaining its reasoning with respect to:  (1)

resorting to facts available, or (2) its facts available selections.[2]  On remand, Commerce did not

address the court's concerns, but rather adhered to its prior methodology and provided no rational

explanation for its choices.[3]

## I.  The Availability of Data for Calculating a Facts Available Profit Cap

In Geum Poong I, the court held that in calculating CV profit under a facts available

methodology, i.e., one that employs Alternative Three without the profit cap, Commerce may

rely on any data available to it, which may include some non-home market sales data, provided

its method is reasonable and it provides an adequate explanation thereof. "  Geum Poong I at 676.

The court found, however, that Commerce did not explain whether any data were available to

calculate the profit cap, and noted that Commerce failed to address the adequacy of the financial

statements for Samyang, Saehan Industries, Inc., and SK Chemicals that had been submitted by

---

[2] The Statement of Administrative Action, accompanying H.R. Rep. No. 103-826(I), at 840 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4176 (1994) [hereinafter "SAA"], specifies that "[i]f [Alternative Three] is selected, Commerce will provide to interested parties a description of the method chosen and an explanation of why it was selected."

[3] In its previous decision, the court upheld two other aspects of Commerce's determination which are unrelated to the profit calculation.  Defendant did not respond to Plaintiffs' objections to the remand redetermination.

Geum Poong in response to Commerce's January 11, 2000 request for additional information.

Id. at 678 & nn. 12, 14.  The court also found that Commerce failed to explain why the BOK data

do not serve as a basis for calculating a "facts available profit cap."  Id. at 678-79.  Accordingly,

in Geum Poong I, the court instructed Commerce to calculate a "facts available profit cap," or to

explain why such a calculation could not be made in this case.

In the Remand Determination, Commerce explained that it could not calculate an

appropriate "profit cap" because the four possible sources of data included or were likely to

include non-home market sales.[4]  Commerce stated:

> With the exception of the Samyang CV profit data developed . . . in the
> underlying investigation . . . all of the profit data on the record of this proceeding
> is flawed for purposes of calculating a profit cap because it includes, or is likely to
> include, profits earned on sales outside of Korea.  Consequently, as a matter of
> law and regulation, these sources could not be used as a profit cap and, lacking a
> profit cap, the Department was forced to use the methodology contemplated in the
> SAA, i.e., to apply alternative (iii) on the basis of the facts available (SAA at
> 841).

Remand Determination at 4.

Commerce ignores the court's specific instruction to apply a "facts available profit cap" if

a reasonable means of calculating one could be devised.   Rather than assess the reasonableness

of using any of the four available sources in light of perceived deficiencies, Commerce merely

---

[4]Commerce explains why the following sources were inappropriate for a profit cap under
1677b(e)(2)(B)(iii):  (1) Geum Poong's reported profit reflected profits from several of Geum
Poong's third country markets; (2) Sam Young's profit was not based on home market sales, and
although Samyang's profit reflected profits exclusively on sales in the Korean market, the use of
Samyang's profit would have impermissibly revealed its proprietary profit ratio; (3) information
regarding the public audited financial statements of certain PSF producers (Samyang, Saehan and
SK Chemicals) indicated that these producers also had sales outside the Korean market; and (4)
BOK data likely included companies that sell outside of the Korean market.  Remand
Determination at 2-3.

reiterates its previous argument that it cannot apply a profit cap because the statute limits it to considering profit rates earned on sales in Korea. Commerce essentially considers itself compelled to reject any data that may include <u>any</u> non-home market sales, even when calculating a "facts available profit cap."

By its nature, however, a "facts available profit cap" contemplates that there may be some deficiencies in the data, e.g., the data include some non-home market sales.[5] As the court stated in <u>Geum Poong I</u>, "the SAA, while approving Commerce's 'no profit cap' methodology for cases where no cap data is available at all, provides no guidance in the case of a technically deficient cap. . . . Because the statute mandates the application of a profit cap, Commerce cannot sidestep the requirement without giving adequate explanation even in a facts available scenario." <u>Geum Poong I</u> at 679. The court also noted that "in applying facts available, Commerce complies with statutory provisions to the extent possible." <u>Geum Poong I</u> at 675 n.8. In calculating a "facts available profit cap," therefore, Commerce must determine whether the

---

[5] According to the SAA, Commerce may calculate CV profit under Alternative Three without applying the profit cap, that is, under "facts available" under certain circumstances. The SAA explains that:

> The Administration . . . recognizes that where, due to the absence of data, Commerce cannot determine amounts for profit under alternatives (1) and (2) or a "profit cap" under alternative (3), it might have to apply alternative (3) on the basis of "the facts available." This ensures that Commerce can use alternative (3) *when it cannot calculate the profit normally realized by other companies on sales of the same general category of products*.

SAA at 841, <u>reprinted in</u> 1994 U.S.C.C.A.N. at 4177. Although the statute indicates that the profit cap is to be based on home-market sales, the SAA contemplates only that Commerce will dispense with the profit cap when profit data are unavailable with respect to other companies on sales of the same general category of products. The SAA says nothing about dispensing with the profit cap when segregated data on solely home market sales are unavailable.

sales outside of Korea, or any other identified deficiency in the data, are of such extent that using the data would render the profit cap calculated therefrom unreasonable or inaccurate. In this case, Commerce did not determine that any of the data sources were predominantly or exclusively non-home market sales. Nor did Commerce assess the relative validity among the sources in light of their deficiencies. Therefore, Commerce did not fulfil its obligation to determine whether a reasonable "facts available profit cap" could be applied, and has not presented sufficient grounds for dispensing with the profit cap altogether.

## II. Reasonableness of Commerce's Selected Methodology

In Geum Poong I, the court found that even if Commerce's decision to calculate CV profit under Alternative Three without the profit cap were justified, Commerce failed to explain adequately the reasonableness of the methodology it actually employed. Specifically, the court found that Commerce failed to account for: (1) its rejection of the financial statements of three Korean PSF producers, and (2) potential sources of distortion including (a) the likelihood of double-counting Samyang and/or Sam Young data; (b) the use of a simple average of company-specific data with industry wide data, each comprising a different scope of merchandise; and (c) the apparent inconsistency in its statements as to which companies were included in the BOK data.

### 1. Rejection of Audited Financial Statements

On remand, Commerce explains that it did not use the audited financial statements of three PSF producers (Samyang, Saehan, and SK Chemicals) because it "is cautious about using company specific data submitted by parties . . . because parties can be expected to submit only data that is favorable to them." Remand Redetermination at 5. Commerce also expresses

concern with the "low" profits for these three companies, claiming that "[o]ther Korean producers and exporters, whose financial results were not submitted, might have had higher rates." Id. Commerce also questions the usefulness of the financial statements on the ground that they reflected the financial results for the entire operations of these companies and likely included non-subject merchandise and sales to the United States.

The court rejects Commerce's explanations for three reasons. First, the financial statements were submitted by Geum Poong in response to Commerce's January 11, 2000 request for additional information. See Letter from Susan H. Kuhbach (Jan 11, 2000), P. R. Doc. 247. In this request, Commerce indicated that "any information submitted must be credible and self-verifying, e.g., audited financial statements of Korean firms that produce merchandise in the same general category as subject merchandise." Id. Commerce does not state that the statements submitted did not meet its description, and it could have requested still more information if it considered the submission somehow incomplete. Second, Commerce deems the profits "low" without indicating any basis for comparison. If Commerce suspected that other PSF producers may have higher profit levels, it could have sought additional information from Geum Poong or a third source. Commerce has not presented any reason other than speculation why the profits for these three companies are unrepresentative of the profit experience of PSF producers in Korea.

Third, Commerce's refusal to use this data is inconsistent with its past practice of accepting profit data from financial statements of exporters to calculate CV profits as "facts available" under Alternative Three. For example, in Shop Towels from Bangladesh, 61 Fed. Reg. 55,957, 55,961 (Dep't Comm. 1996) (final admin. rev.), Commerce calculated CV profit by relying on actual profit data from the financial statements of three Bangladesh-based producers of

products in the same general category as those under investigation. Commerce accepted the

financial statements in that case notwithstanding petitioner's claims that two of the companies'

annual reports do not indicate whether they export merchandise, and that there was reason to

believe the third in fact included export sales. Commerce indicated that it was sufficient that

there was evidence of sales in Bangladesh. In contrast, Commerce rejected the use of financial

statements for a Bangladesh textile company that made only export sales. Id. at 55,960 cmt. 3.

In this case, Commerce states that "information indicates that [the three producers] also had sales

outside the Korean market," but does not maintain that any of the three Korean PSF producers

sold exclusively or even primarily for export, either to the U.S. or to third country markets.[6]

---

[6] The court notes that, since the Final Determination, Commerce recognized that circumstances may warrant the use of other companies' financial statements to calculate CV profit under Alternative Three notwithstanding the possible inclusion of some U.S. sales. In Pure Magnesium from Israel, 66 Fed. Reg. 49,349, (Dep't Comm. Sept. 27, 2001) (final determ.), Commerce calculated CV profit under Alternative Three using as a profit source the financial statements of a producer of goods in the same general category despite the fact that these statements included export sales, which may or may not have included U.S. sales. In that case, Commerce indicated that it weighed several factors, including: (1) the similarity of three potential surrogate companies' business operations and products to the respondent's; (2) the extent to which the financial data of the surrogate company reflects sales in the United States as well as the home market; and (3) the contemporaneity of the surrogate data to the POI. Id. at cmt. 8. Commerce explained the factors as follows:

> [1] The greater the similarity in business operations and products, the more likely that there is a greater correlation in the profit experience of the two companies.
> [2] Concerning the extent that U.S. sales are reflected in the surrogate's financial statements, because the Department is typically comparing U.S. sales to a normal value from the home market or third country, it does not want to construct a normal value based on financial data that contains exclusively or predominantly U.S. sales. Further, in accordance with § 1677b(e)(2)(b) generally, we seek to the extent possible home market profit experience. [3] Finally contemporaneity is a concern because markets change over time and the more current the data the more reflective it would be of the market in which the respondent is operating.

Id. Commerce then analyzed each factor with respect to each potential surrogate. Thus, although

Remand Determination at 3.

In sum, Commerce has not provided a valid reason why the profit experience of the three companies would be unrepresentative of home market sales experience, nor is its determination in accordance with past practice. This is not to say, however, that Commerce was bound to use the financial statements. If Commerce had alternative sources of data that would be equally or more reliable and/or representative of home market profit experience, it is within Commerce's discretion to use either set of data. The court finds, however, that to date Commerce's selection of an alternate methodology is unsupported.

2. Simple Average of Sam Young's and Samyang's Profit Rates with the BOK Data

a. Double Counting

In Geum Poong I, the court instructed Commerce to reevaluate its method of combining company-specific data with industry-wide data to determine CV profit in light of the possibility that Samyang's and Sam Young's data already may have been included in the BOK data. On remand, Commerce acknowledges that Samyang and Sam Young's data were likely included in the BOK average. Commerce asserts that its combination was the best alternative under the following reasoning: (1) Samyang's calculated profit rate should be given weight because it was based on sales in Korea; (2) because that rate is proprietary, Samyang's profit could not be used by itself; (3) Sam Young's profit rate could not be used alone because it reflects profits earned on

_____

Commerce seeks "to the extent possible" to determine "home market profit experience," it need not reject financial statements of a potential surrogate simply because that company made some non-home market sales. In this case, Commerce has not identified or weighed any factors, but instead categorically disqualified a potential source of data based on the mere possibility of some non-home market sales. Commerce has not stated that the sales of these companies are "predominately or exclusively" to the United States or to third country markets.

third country sales, not home market sales; and (4) the BOK data could not be used alone on the ground that, as the data likely reflect a wide range of products and the experience of much of the Korean industry, they reflects profits earned in all markets.  Commerce indicates that under these circumstances, it chose to combine the BOK data with the Samyang and Sam Young profit data in order to give "greater weight" to the latter.  Commerce stated its reasoning as follows:

> Given the options available for using these sources singly or in combination, the Department decided to combine the Samyang, Sam Young, and BOK data.  In doing so, the Department was able to incorporate Samyang's home market profit experience with other useable data from Sam Young and the BOK.  The two investigated companies, Samyang and Sam Young were effectively given greater weight because their data conformed to the subject merchandise and did not include profits earned in the United States.  However, weight was also given to the BOK data because it reflected the experience of the broader Korean industry and it included home market profits.

Remand Determination at 5-6.  Commerce admits that this method likely caused Samyang and Sam Young to be double-counted, but explained that the likelihood of skewed results is very small for two reasons:  (1) Commerce states that it was aware of at least 25 producers of PSF in Korea, and therefore the profit rates for Sam Young and Samyang as reflected in the BOK data were diluted; and (2) the Samyang and Sam Young profit rates reflected in the BOK data likely differed from the profit rates calculated by the Department for these companies.[7]

Commerce's justification for its decision to combine the data is not rational, and skirts the court's concerns regarding skewed results.  First, Commerce's explanation that Sam Young's data should be given "greater weight" because it did not have U.S. sales is disingenuous.  Commerce admitted that Sam Young's profit is not based on any home market sales whatsoever.

---

[7] Commerce indicates that its Samyang and Sam Young calculations were obtained from comparison market sales made in the ordinary course of trade

If anything, double-counting Sam Young's data would result in a *less* accurate measure of the

CV profit rate than if it were excluded entirely because the goal in calculating CV profit is to

approximate the home market profit experience. [8] Furthermore, double-counting is ordinarily a

problem that the agency seeks to correct if possible, rather than a methodology adopted to assign

more weight to a particular set of data.[9] There is no support for the proposition that Commerce's

---

[8] Commerce further explained that:

Under this logic, it would not have been correct for the Department to include the
profit rates for the companies, other than Samyang, whose public audited financial
statements were submitted by Geum Poong. In particular, because these financial
statements reflected the financial results for the entire operations of these
companies, they likely included non-subject merchandise and sales to the United
States. Thus, they did not likely present information that was as useful as the
profit rates calculated by the Department for Sam Young and Samyang, nor did
they have the advantage of presenting a broad picture of the Korean industry.

Commerce's explanation misses the mark, since the financial statements apparently
reflect sales in the same general category, and include home market sales. See discussion
under II.1, supra.

[9] The facts of this case stand in contrast to those in Asociacion de Productores de Salmon
y Trucha de Chile, 180 F. Supp. 2d 1360, 1365- 68 (Ct. Int'l Trade 2002). There, the
Commission had access to two sets of data for the period 1994-1998. The first set was
"consolidated subject producer data" submitted by a salmon producers association that
incorporated estimated production and capacity information for a number of smaller Chilean
salmon producers. Larger producers individually submitted data, which included production and
capacity data from a producer already included in the association's submission, Fiordo Blanco.
Because the two sets of data were added together to arrive at a total figure for production and
capacity, the data for this producer would be included twice. The Commission was able to
correct for the double-counting of data for the period 1994-1997 by deducting from the
consolidated producer data the amounts for the individual producer indicated in the larger
producers' submitted data. The Commission did not do so for the 1998 data, however, because
the actual production and capacity levels for Fiordo Blanco in 1998 were much higher than the
association's estimate for that year. As a result, exclusion of the actual individual producer's
data from the estimated amounts would further underestimate the subject producers' production
and capacity levels for that year. In addition, the association admitted to unidentified "clerical
errors" and was unable to provide the Commission with "deconsolidated production data" that

discretion to give particular data more weight includes the discretion to distort reality

intentionally by factoring into its calculations a preferred set of data more than once, if such

double-counting can be avoided. Cf. Pohang Iron & Steel Co. v. United States, 118 F. Supp. 2d

1328, 1328-29 (2001) (upholding calculations unavoidably incorporating known double-counting

where a respondent failed to submit all information necessary to enable Commerce to resolve the

double-counting issue definitively).

Second, Commerce has not given a rational or factually-supported basis for its assertion

that the potential for skewed results is minimal. The absolute number of producers overall in

some cases may be relevant to whether double-counting substantially distorts an agency's

calculations. In this case, however, Commerce had indicated in the Final Determination that

Samyang and Sam Young "comprise a substantial portion of the industry." Final Determination

at cmt. 15. Logically, if either of these companies represent a dominant share of the Korean

market, its profit rate may be substantially higher than the other companies figuring in the BOK

data, or for some other reason be unrepresentative of profits "normally realized" by other

companies producing goods in the same general category as the subject merchandise. This

potential source of distortion would be the case irrespective of the number of Korean man-made

---

would indicate how its estimates for Fiordo Blanco were calculated. Thus, the Commission
determined that excluding the individual producer's actual data would give less accurate results,
and declined to make the adjustment. The court held that the Commission's decision was
reasonable because, faced with a choice between imperfect alternatives, the Commission opted
for the one that it considered less inaccurate.

In this case, Commerce states that the figures for Samyang and Sam Young "likely differ"
from those already included in the BOK data, but does not indicate that its figures are more
accurate, or that the BOK data itself is inaccurate, as in Asociacion Productores de Salmon y
Trucha de Chile. Commerce was not forced to choose between imperfect alternatives, but made
a methodological choice to assign greater weight to a particular set of data by double-counting it.

COURT NO. 00-06-00298 PAGE 13

fiber producers overall. Counting potentially anomalous profit rates twice, therefore, would give a misleading picture of the profit experience of other Korean producers of goods in the same general category as the subject merchandise.

On remand, Commerce has not addressed the concerns regarding the potential for double-counting expressed in Geum Poong I, or made any other findings to aid the court in assessing the reasonableness of its new combination methodology.

b. Mixed Data Sets

The court charged Commerce with reassessing on remand the reasonableness of its method of taking a simple average of company-specific data (i.e., the Samyang and Sam Young data) with industry wide data (i.e., the BOK data), when the former is limited to one product-type and the latter includes all man-made fibers. On remand, Commerce admits that the combination of company-specific data with industry-wide data for calculating CV profit is unprecedented.[10] Commerce asserts, however, that this combination allows it to include "as much information as possible" to determine Geum Poong's CV profit "as accurately as possible." Remand Redetermination at 6. It is not clear to the court how more information necessarily equates to more accurate information. Performing calculations with data simply because they are available

---

[10] In other cases, Commerce has calculated CV profit based on either company/product-specific information or on industry-wide profit information. See, e.g., Honey from Argentina, 66 Fed. Reg. 50,611, at cmt. 2 (Dep't Comm. 2001) (final determination) (Commerce calculated CV profit based on cost of production figures from studies published in a publicly available trade publication for the Argentine honey industry provided by the petitioners); Fresh Kiwifruit from New Zealand, 62 Fed. Reg. 47,440, 47,441 (Dep't Comm. 1997) (final determination) (in the absence of data on exporters' home market sales profits, Commerce used the average profit of twenty sampled growers to calculate CV profit); Fresh Atlantic Salmon from Chile, 63 Fed. Reg. 31,411, 31,435 (Dep't Comm. 1998) (final determination) (Commerce based CV profit on a weighted average of company-specific profit rates of four other Chilean producers).

may give the illusion of accuracy, but this hardly constitutes a "reasonable methodology." In the absence of any precedent or valid explanation of why mixing two data sets with the product group of one fully encompassed in that of the other, the court finds that Commerce has not established that its methodology is reasonable or supported by the evidence of record.

c.  Inconsistency

In Geum Poong I, the court directed Commerce's attention to an apparent inconsistency in its justification for combining the Samyang and Sam Young profit rates with the BOK data (i.e., that the latter includes data for Saehan Industries and SK Chemicals), with its claim that it used a simple average as "facts available" in part because Commerce was unaware of which companies were included in the BOK data. On remand, Commerce fails to appreciate the court's concern, stating only that it "made a single assumption about which companies are likely reflected in the BOK data," and that "it is best to treat the BOK data as including most, if not all of Korean producers of manmade fibers." Remand Determination at 7. In its explanation of why it did not use the audited financial statements for three Korean PSF producers submitted by Geum Poong, Commerce states that "the financial results of two of these companies, Saehan Industries, and SK Chemicals, were included in the BOK data. The third company's data, i.e., Samyang's data, were used, albeit in a different form." Remand Determination at 6. Commerce also indicated in its explanation of the effect of double-counting that a total of 25 PSF producers are included in the data, yet it does not indicate the source of this information. Either Commerce knew which companies were included in the BOK data or it did not. It is not clear to the court how Commerce could know that the financial statements of the companies were included in the

BOK data – much less that those of one company appeared "in a different form" – if it considered itself forced to reject the BOK data, for the purpose of calculating a profit cap based on an "assumption" as to which companies were included in the BOK data and the likelihood that these companies sell outside Korea.  Thus, in the Remand Determination, Commerce leaves unaddressed the inconsistency about which the court had expressed concerns.

**CONCLUSION**

Accordingly, the court rejects as unreasonable and unsupported Commerce's determination to dispense with the profit cap and its methodology in calculating CV profit. Commerce must determine Geum Poong's CV profit rate by (1) applying a facts available profit cap, which may or may not include non-home market sales;[11] and (2) calculating a profit rate derived from the financial statements for Samyang, Saehan, and SK Chemicals, or from the industry-wide BOK profit data, or some other method that will avoid the deficiencies described herein.

_____

Jane A. Restani

Judge

DATED:  New York, New York

This 8th of March, 2002.

_____

[11] Commerce may dispense with the profit cap only if available data are significantly undermined by non-home market data.

**ERRATUM**


Geum Poong Corp. v. United States, Consolidated Court No. 00-06-00298, Slip Op. 02-26, dated March 8, 2002.


Page 1: Counsel for plaintiffs should read as follows:


   Sandler, Travis & Rosenberg, P.A. (Philip S. Gallas, Gregory S. Menegaz and Mark R. Ludwikowski) for plaintiffs.


March 13, 2002.