**Slip Op. 02-95**

# UNITED STATES COURT OF INTERNATIONAL TRADE

---

|  |  |  |
|---|---|---|
| GEUM POONG CORPORATION and SAM YOUNG SYNTHETICS CO., LTD., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | Consolidated |
| | : | Court No. 00-06-00298 |
| THE UNITED STATES, | : | |
| | : | |
| | : | |
| Defendant, | : | |
| | : | |
| v. | : | |
| | : | |
| E.I. DUPONT DE NEMOURS, INC.; | : | |
| ARTEVA SPECIALTIES S.a.r.l., | : | |
| d/b/a KoSa; and WELLMAN, INC., | : | |
| | : | |
| Defendant-Intervenors. | : | |

---

[ITA's antidumping duty remand determination affirmed.]

Dated: August 22, 2002

Sandler, Travis & Rosenberg, P.A. (Philip S. Gallas, Gregory S. Menegaz and Mark R. Ludwikowski) for plaintiffs.

Robert D. McCallum, Jr., Acting Assistant Attorney General, David M. Cohen, Director, Lucius B. Lau, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Jonathan Sills), Scott D. McBride, Office of the General Counsel, United States Department of Commerce, of counsel, for defendant.

Collier Shannon Scott, PLLC (Paul C. Rosenthal and David C. Smith, Jr.) for defendant-intervenors.

**<u>OPINION</u>**

**RESTANI, Judge:**

This matter comes before the court as a result of the court's decision in <u>Geum Poong Corp. v. United States</u>, 193 F. Supp. 2d 1363 (Ct. Int'l Trade 2002) [hereinafter, "<u>Geum Poong II</u>"]. There, the court had remanded the Department of Commerce's ("Commerce") <u>Final Results of Redetermination Pursuant to Court Remand</u>, (October 5, 2001) [hereinafter "First Redetermination"], which failed to address the court's concerns in <u>Geum Poong Corp. and Sam Young Synthetics Co., Ltd., v. United States</u>, 163 F. Supp. 2d 669 (Ct. Int'l Trade 2001) [hereinafter "<u>Geum Poong I</u>"] regarding the calculation of Geum Poong's Constructed Value ("CV") profit in the investigation <u>Certain Polyester Staple Fiber from the Republic of Korea and Taiwan</u>, 65 Fed. Reg. 16,880 (2000), <u>amd'd</u>, 65 Fed. Reg. 33,807 (Dep't Comm. 2000) (final determ.) [hereinafter "Final Determination"]. The court now reviews Commerce's <u>Final Results of Redetermination Pursuant to Court Remand Order</u>, (May 1, 2002) [hereinafter, "Second Redetermination"].[1]

**JURISDICTION**

The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000), which provides for judicial review of a final determination by the Department of Commerce in accordance with the provisions of 19 U.S.C. § 1516a(a)(2)(B)(i) (1994).

**BACKGROUND**

In <u>Geum Poong II</u>, the court rejected as unreasonable and unsupported Commerce's

---

[1] Familiarity with the earlier decisions is presumed. Commerce's decisions on non-profit rate issues were sustained in <u>Geum Poong I</u>.

calculation on remand of Geum Poong's CV profit under 19 U.S.C. § 1677b(e)(2)(B) (2000).

The court found that Commerce had failed to determine whether an appropriate profit cap could

be applied, and had not presented sufficient grounds for dispensing with the profit cap altogether.

See Geum Poong II, 193 F. Supp. 2d at 1366-67.  The profit cap is mandated by statute for the

method of profit rate calculation chosen by Commerce.  See 19 U.S.C. § 1677b(e)(2)(B)(iii).[2]

The court also rejected Commerce's explanation of the reasonableness of its chosen

methodology.  See Geum Poong II, 193 F. Supp. 2d  at 1367.  Specifically, the court found that

Commerce in its First Redetermination:  (1) did not provide a valid reason why the profit

experience of three other Korean producers of PSF – Samyang, Saehan, and SK Chemicals –

would be unrepresentative of Geum Poong's home market sales experience; and (2) failed to

account for certain deficiencies and inconsistencies in its method that likely would skew the

calculations.   Id.

The court therefore instructed Commerce to redetermine Geum Poong's CV profit rate by

applying a capped profit rate, unless available data would render the cap unrepresentative or

inaccurate and specifically if available data to calculate a cap were "significantly undermined" by

non-home market data.  Id. at 1367, 1372 & n.11.   The court also ordered Commerce to

reevaluate the available data sources for calculating a CV profit rate, drawing attention to the

factors Commerce identified and weighed in Pure Magnesium from Israel, 66 Fed. Reg. 49,349,

---

[2] Under Alternative Three, Commerce may calculate CV profit by "any . . .  reasonable method, *except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise* [.]"  19 U.S.C. § 1677b(e)(2)(B)(iii) (emphasis added). The emphasized portion of Alternative Three is referred to as the "profit cap."  See Floral Trade Council v. United States, 41 F. Supp. 2d 319, 326-27 (Ct. Int'l Trade 1999).

(Dep't Comm. Sept. 27, 2001) (final determ.), namely: (1) the similarity of the potential

surrogate companies' business operations and products to the respondent's; (2) the extent to

which the financial data of the surrogate company reflects sales in the United States as well as

the home market; and (3) the contemporaneity of the surrogate data to the period of investigation

("POI").  See Geum Poong II, 193 F. Supp. 2d at 1368 n.6.  The court specified that on remand

Commerce must calculate a profit rate derived from the financial statements of the three other

Korean PSF producers, or from the industry-wide Bank of Korea ("BOK") profit data, or some

other method that would avoid the deficiencies identified by the court.  See id. at 1372.

## DISCUSSION

In calculating a profit cap in the Second Redetermination, Commerce preliminarily

rejected the use of the financial statements of Samyang, reasoning that because "50.6% of the

company's sales are to export markets . . . Samyang's sales are predominantly non-home market

sales and, under the Court's standard, Samyang's profit should not be used to calculate a facts

available profit cap."   Second Redetermination at 4.  Commerce then assessed the relative

validity of the remaining sources – i.e., the BOK data, and the financial statements for Saehan

and SK Chemicals.  Commerce evaluated the data according to two factors used in Pure

Magnesium from Israel --  (1) the similarity of the merchandise to the subject merchandise; (2)

the contemporaneity of the data source with the POI -- as well as an additional factor, the "extent

of detail provided," for the purpose of accounting for the change in value of currency.

Commerce rejected the use of the BOK data principally on the grounds that the BOK data

corresponded to the "manmade fibers" industry, which it considered as likely to cover more

products than just the subject merchandise.  As a result, Commerce calculated a facts available

profit rate based on a simple average of the profit rates of Saehan and SK Chemicals, which

satisfies the cap language of the statute.[3]  Applying this profit rate, Commerce calculated a <u>de minimis</u> anti-dumping duty rate of 0.12 percent for Geum Poong, and revoked the antidumping duty order for that company.  Second Redetermination at 10.

The Domestic Industry ("Petitioners") protests Commerce's reliance on the Saehan/SK data and requests that the court direct Commerce to apply the actual, weighted average profit rate for Samyang and Sam Young as the surrogate facts available profit rate for Geum Poong.  For its part, Geum Poong requests that the court order Commerce to publish written notice of the lifting of suspension of entries and revised antidumping margins within ten days of the date upon which

_____

[3] Although attempting to comply with the court's instructions to calculate "facts available profit cap," Commerce characterizes the instruction as imposing an "extra step," that was "not articulated in either the statute, or the [Statement of Administrative Action]" created by the court through a misinterpretation of its analysis in <u>Pure Magnesium From Israel</u> 66 Fed. Reg. 49,349, (Dep't Comm. Sept. 27, 2001) (final determ.) ("Facts available profit cap" was a short-hand description of a profit cap which may contain some non-home market sales but that Commerce may still find probative.).  <u>See</u> <u>Statement of Administrative Action</u>, accompanying H.R. Rep. No. 103-826(I) (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N. 4040 (1994) [hereinafter "SAA"]).  In <u>Geum Poong I</u>, the court explained that "the SAA, while approving Commerce's 'no profit cap' methodology for cases where no cap data is available at all, provides no guidance in the case of a technically deficient cap. . . . Because the statute mandates the application of a profit cap, Commerce cannot sidestep the requirement without giving adequate explanation even in a facts available scenario." <u>Geum Poong I</u>, 163 F. Supp. 2d at 679 (footnote omitted).  The court further specified that "Although the statute indicates that the profit cap is to based on home-market sales, the SAA contemplates only that Commerce will dispense with the profit cap when profit data are unavailable with respect to other companies on sales of the same general category of products. The SAA says nothing about dispensing with the profit cap when segregated data on solely home market sales are unavailable." <u>Geum Poong II</u>, 193 F. Supp. 2d at 1366-67 n.5.  Rather than lacking any usable data whatsoever, Commerce in this case possessed various sets of data that were each deficient in some way, although the significance of the deficiency was not made clear. Consequently, the court instructed Commerce that it must assess the relative merits of existing data sets in calculating a profit cap before dispensing with the profit cap altogether, given Commerce's obligation in applying facts available to comply with statutory provisions "to the extent possible." <u>Geum Poong I</u>, 163 F. Supp. 2d at 675 n.8.  The court cited <u>Pure Magnesium from Israel</u> as an illustration of the factors Commerce has evaluated in the past.  Commerce's contention that the court has imposed an additional burden on the agency is therefore wholly without merit.

the court's decision becomes final.


## I. Petitioners' Claims:  Calculation of Constructed Value

Petitioners claim that Commerce erred in relying on the Saehan/SK data on the ground that the record is devoid of any specific information about these companies, such as what products they produced and to which markets they sell.   Petitioners maintain that although the data relied upon by Commerce "might be reasonable under other circumstances," they are "unequivocally not reasonable where Commerce possesses more accurate, more reliable, and more probative surrogate profit data that reflects the 'home market profit experience' of Korean polyester staple fiber ("PSF") producers," namely the weighted average profit rate for Samyang and Sam Young.  Dom.  Objections, at 2-3.  Second, Petitioners argue that because Commerce relied on the Samyang/Sam Young data for surrogate selling calculation, it is required to rely on the same set of data for calculating surrogate profit data, or otherwise explain the choice of a new data set.


## A. Commerce's Discretion to Choose among Reasonable Methods

Petitioners claim that Commerce's use of a particular data set in this case, although "otherwise reasonable," is necessarily unreasonable where another data set is allegedly "more accurate, more reliable, and more probative."   Petitioners' argument misrepresents the agency's burden and misconstrues the court's role in reviewing Commerce's choice of methodology.   "If relevant information is missing from the record, "Commerce . . . must make [its] determinations based on all evidence of record, weighing the record evidence to determine that which is most probative of the issue under consideration."  SAA at 869.   Nevertheless, Commerce need not

show that its methodology was the only way or even the best way to calculate Geum Poong's CV profit rate. "When Commerce's method is challenged, the Court's proper role is to determine whether the methodology is in accordance with law and supported by substantial evidence. Assuming both criteria are satisfied, the Court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." Shandong Huarong General Corp. v. United States, 159 F. Supp 2d 714, 720-21 (Ct. Int'l Trade 2001) ("Commerce need not prove that its methodology was the only way or even the best way to calculate surrogate values for factors of production as long as it was reasonable.").

Thus, the court must review whether Commerce's choice of methodology is reasonable of itself and in accordance with the law, and whether its application thereof is supported by substantial evidence, not whether there existed a more accurate way of calculating Geum Poong's CV profit rate. "In seeking the appropriate facts upon which the agency intends to rely, Commerce enjoys broad discretion," which "'is subject to a rational relationship between data chosen and the matter to which they are to apply.'" Allied Tube and Conduit Corp. v. United States, 132 F. Supp. 2d 1087, 1095 (Ct. Int'l Trade 2001) (citing Mannesmannrohren-Werke AG v. United States, 120 F. Supp. 2d 1075, 1088-89 (Ct. Int'l Trade 2000), and Manifattura Emmepi S.p.A. v. United States, 16 CIT 619, 624, 799 F. Supp. 110, 115 (1992)).

It is extremely difficult to decide which substitute information is "more accurate" or "most probative." By definition, when surrogates or substitutes are used, there is a built-in inaccuracy.[4] Precision is not a standard which the court may search for in such circumstances. Nonetheless, some choices may represent an abuse of discretion, which is not the case here, as

---

[4] Geum Poong lacked home market sales of the subject merchandise. Therefore, its own profit data could not be used to calculate a home market profit rate.

there is no better selection which has been shown to be usable.

## B. Framework for Assessing Relative Merits of Surrogate Companies' Data

Commerce appears to read the court's instructions in Geum Poong II as mandating a particular framework for analysis in constructing a profit cap, pursuant to which the agency is to determine first whether the potential surrogate's sales are "predominantly . . . non-home market sales," and then to assess the relative validity among the remaining sources in light of their deficiencies. Second Redetermination at 4. Commerce states that "[t]he test for rejection of a company's profit in Commerce's calculations of a 'profit cap,' as expressed by the court, was whether the 'sales of th[o]se companies [were] 'predominantly or 'exclusively' to the United States or to third country markets.'" DOC Response at 8.

The court in Geum Poong II stated:

In calculating a 'facts available profit cap' . . . Commerce must determine whether the sales outside Korea, *or any other identified deficiency in the data*, are of such extent that using the data would render the profit cap calculated therefrom unreasonable or inaccurate. In this case Commerce did not determine that any of the data sources were predominantly or exclusively non-home market sales. Nor did Commerce assess the relative validity among the sources in light of their deficiencies. Therefore, Commerce did not fulfil its obligation to determine whether a reasonable 'facts available profit cap' could be applied, and has not presented sufficient grounds for dispensing with the profit cap altogether."

193 F. Supp. 2d at 1367 (emphasis added). Thus, rather than separate out the existence of non-home market sales as a threshold inquiry, the court merely summarized Commerce's failure to make any findings that would support its decision to dispense with calculating a profit cap. Id. Nevertheless, Petitioners do not dispute Commerce's analytical framework or its reading of the court's directive in Geum Poong II. Given the overarching statutory goal of approximating a respondent's home market experience, Commerce's emphasis on geographical distribution of

sales is warranted here. See 19 U.S.C. § 1677b(e)(2)(B)(iii) (2000) (profit is that realized in connection with sales for consumption in foreign country).[5] The court therefore does not reject Commerce's methodological framework for calculating a profit cap in this case or its decision to reject data based on evidence of predominant or exclusive non-home market sales.

**C. Reasonableness of Commerce's Ranking and Selection of Surrogate Profit Data**

Petitioners claim that under Commerce's factors for evaluating surrogate profit data, the use of Saehan/SK data is unreasonable on the grounds that: (1) the lack of information regarding these companies compels their rejection; and (2) Commerce lacked appropriate grounds for rejecting the Samyang/SamYoung profit data as a potential data source. Petitioners maintain that only the Samyang/Sam Young profit data satisfy all the criteria identified in Geum Poong II.

**1. Lack of Information**

Petitioners contend that the limited record evidence about Saehan/SK profit data reveals that they (a) include sales of a general, unknown category of merchandise of "manmade fibers"; (b) very likely include profit on non-home market sales, including profit on U.S. sales; and (c) correspond to a period prior to the POI.[6] Dom. Ind. Objections, at 2. Commerce responds that it

---

[5] Under § 1677b(e)(2)(B), "foreign country" means "the country in which the merchandise is produced." 19 CFR § 351.405(b)(2).

[6] In calculating a "facts available profit cap" pursuant to the Second Redetermination, Commerce chose to assess in addition to the factors in Pure Magnesium from Israel the "extent of detail provided" In its analysis, Commerce considered the sustained appreciation in value of the won during a portion of the period of investigation. Commerce found that as a result of this sustained appreciation, "it is appropriate to account for the effects of that appreciation in determining a facts available profit cap. The detail provided in the financial statements of Saehan and SK Chemicals permits [Commerce] to do this. The lack of detail in the BOK data precludes such adjustments." Second Redetermination at 5. Neither party contests Commerce's analysis in this regard.

properly analyzed each factor and, acknowledging deficiencies in the data, complied with the court's directive to calculate a facts available profit rate which complies with the statute, to the extent possible.[7]

a.  Similarity of Business Operations & Merchandise

Petitioners contends that Commerce:   (1) conceded that Saehan and SK Chemicals produce "manmade fibers" which "appears to encompass more than just the subject merchandise"; and (2) does not know the percentage of Saehan's or SK Chemicals' business operation accounted for by subject merchandise, if any.  Dom. Ind. Objections at 3.

Commerce found  -- and Petitioners do not contest –  that "[b]oth Saehan and SK Chemicals are producers of the subject merchandise," and noted that "[b]oth companies were named as exporters of subject merchandise in the petition."  Second Redetermination at 4 & n.3. That the companies were respondents in the investigation of PSF strongly indicates that their production of PSF is in substantial quantities such that use of their profit rate to approximate Geum Poong's profit rate is reasonable.  Furthermore, there is no requirement that, in calculating

---

[7]   In the Second Redetermination, Commerce conceded that there are deficiencies in the Saehan/SK data, but found that:

> the record does not provide the Department with a better alternative:  the BOK data supplies even less information on the record, Samyang's financial statement shows a predominance of export sales, and all other options have been rejected or addressed by the Court.  Nevertheless, despite the lack of information, we do not believe the deficiencies force us to reject the data in light of the Court's analysis [and its expectation] that there may be 'deficiencies in the data' when it ordered the Department to calculate a 'facts available profit cap.'

Second Redetermination at 8-9.

a substitute profit rate, Commerce must identify the exact percentage of subject merchandise produced by the potential surrogate. Saehan and SK Chemicals may produce products in addition to the subject merchandise, but Petitioners apparently conflate Commerce's description of Saehan and SK Chemicals' products with that of the BOK data, which specifically referred to the general category "manmade fibers." See id. Selections from the translation of the Bank of Korea data submitted by Geum Poong indicate that the category "Man-made Fibers" includes "nylon, vinyl, polyester, etc. – all regenerated fibers." Letter from Geum Poong to Department (Feb. 8, 2000), P.R. Doc. 348, Geum Poong App. Tab 9, at Exh. A. There is no indication that Saehan or SK produce a range of products as broad as that described in the BOK data.

In fact, the record clearly shows that sales by Saehan and SK Chemicals are apparently concentrated in the polyester fiber and textile market. The General Note to the financial statements for Saehan Industries, Inc. as of December 31, 1998 and 1997 states that the company is "currently engaged in the manufacture and sale of polyester staple fiber, polyester filament, polyester films, resins, sportswear and engineered plastics." Id. at Exhibit C. The 1998 Annual Report for SK Chemicals contains a "Message from the Management," which indicates that it is in the polyester fiber and textile market, and that the company intends to develop high value added and high margin products in this area, and *eventually* diversify and concentrate in new lines of business (such as "health-care and high-tech chemical products"). Id. at Exhibit D (emphasis added). Therefore, Commerce properly found that Saehan and SK Chemicals data produce merchandise similar to that of Geum Poong, and its rejection of the BOK data on the ground that the product scope thereof was too broad is supported.

   b. Contemporaneity

Petitioners argue that Commerce erred in relying on the Saehan/SK data where the

financial statements cover a time period -- calendar year 1998 -- that is not contemporaneous with that of the POI (April of 1998 to March of 1999). Petitioners' argument is disingenuous, as there is a substantial overlap in the coverage dates with the POI. Considering the difficulties Commerce faces in calculating any profit rate in this case, this deficiency appears minor, if it is even a deficiency.

    c. Geographical Distribution of Sales

Commerce conceded that "[l]acking information about the geographical distribution of Saehan's and SK Chemicals' sales, we cannot determine that their sales are predominantly non-home market sales." Second Redetermination at 4. Petitioners claim that because there is no geographic information about these companies' sales, Commerce is unable to judge whether these data include profit from non-home market sales, including sales in the United States. Although this is a serious issue, simply because data is lacking on geographical distribution of sales does not necessarily require their rejection as substitute data.[8] The court in Geum Poong II instructed that it may not "reject financial statements of a potential surrogate simply because that company made some non-home market sales." 193 F. Supp. 2d at 1368 & n.6 (discussing Shop Towels from Bangladesh, 61 Fed. Reg. 55,957, 55,961 (Dep't Comm. 1996) (final admin. rev.)). Rather, Commerce is to weigh the lack of such information in light of other factors and relative to other available sets of data to determine if a usable profit cap could be constructed before dispensing with it entirely.[9] Clearly, Commerce considered the similarity of product lines and the

---

[8] Petitioners do not argue that these companies may have no home market sales; they argue that such sales may be very low. This places them in a different category than Sam Young's sales.

[9] The SAA explains that in using facts available, "[s]ection 776(a) generally will require Commerce to reach a determination by filling gaps in the record due to deficient submissions or

extent of detail of the financial statements to outweigh the lack of information as to the geographical distribution of their sales.

Further, Petitioners have not suggested an approach which renders Commerce's choice an abuse of discretion. The choices Petitioners presented to Commerce were not tenable, as is demonstrated in the following section. As it recognized in its second remand determination, Commerce clearly was permitted by the court to dispense with the profit cap if available data would render the profit cap "unreasonable or inaccurate." Geum Poong II, at 1367. In its conclusion, the court reemphasized that the cap may be dispensed with entirely "if available data are significantly undermined by non-home market data."[10] Id. at 1372 n.11. Commerce appears to have weighed its other options in the context of this standard.

In sum, in the absence of any indication that the data for Saehan or SK Chemicals were "overly compromised" by non-home market sales or other problems, in light of evidence that both companies produced products similar to the subject merchandise in the reasonably contemporaneous period, and in the absence of better choices, Commerce's determination to use data from these companies as "facts available" is reasonable and supported by substantial evidence.

**2. Rejection of Weighted Average of Samyang and Sam Young Profit Data**

---

other causes. Therefore, . . . Commerce . . . [need not] prove that the facts available are the best alternative information. Rather the facts available are information or inferences which are reasonable to use under the circumstances." SAA at 869

[10] Thus, Petitioners' argument that use of Alternative Three, without a profit cap, as envisioned by the SAA at 841, is impossible under the court's view of the statute is untenable.

Petitioners contend that Commerce failed to comply with the statutory provisions "to the extent possible" in rejecting the weighted average of the actual profit figures for Samyang and Sam Young where (1) profit data was available for both Samyang and Sam Young that excluded U.S. sales; (2) Samyang, Sam Young and Geum Poong all have very similar business operations by virtue of their production of the subject merchandise," as Samyang produced "virgin" PSF and Sam Young produced exclusively "regenerated" PSF, both of which are within the scope of the subject merchandise; and (3) data for Sam Young and Samyang are contemporaneous with the POI.

Commerce responds that, irrespective of the merits of the data cited by Petitioners, it could not calculate a facts available profit cap using a weighted average of profit data for Sam Young and Samyang.   Commerce maintains that the court in Geum Poong I sustained its decision to reject this method, where:  (1)  the profit data for Sam Young was derived from all non-home market sales, and therefore inappropriate; (2) "the only number that Commerce could have used in such weighted average would have been Samyang's calculated profit data . . . [which ] would have violated the administrative protective order."  DOC Response at 11. approve

The court in Geum Poong I sustained Commerce's decision to reject using a weighted average of the Samyang and Sam Young data for the purpose of calculating Geum Poong's CV profit rate under Alternative Two, rather than Alternative Three which was used in the Second Redetermination.[11]  Nevertheless, the reason for rejecting the methodology under Alternative Two applies to Alternative Three, as well.  A calculation of the profit rate or the profit cap under

---

[11] See Geum Poong I, at Section I.A for a discussion of the interrelationship among the three Alternatives provided for under § 1677b(e)(2)(B) in determining CV profit where actual data are not available under § 1677b(e)(2)(A).

Alternative Three using facts available lacks Alternative Two's prohibition on use of non-home

market profit data, yet the geographical distribution of sales is still a factor in analyzing whether

to use a particular data source. In this case, Sam Young's known lack of home market sales

would be sufficient grounds for rejecting its profit data under Alternative Three, regardless of the

similarity of its products to Geum Poong's, and the resulting use of Samyang's profit data alone

would violate the administrative protective order. The court in Geum Poong I did not hold, as

Petitioners assert, that the use of non-home market profit data is "not a concern" in a facts

available situation. Rather, the court instructed that the existence of some non-home market

sales is not grounds to categorically reject data and resort to applying Alternative Three without

the profit cap required by statute. In this case, Commerce knew for a fact that Sam Young lacked

any home-market sales, and thus rejection of its data was warranted in calculating CV profit

under any Alternative.[12]

---

[12] This is not to say, however, that the court has concluded that Commerce's rejection of Samyang's profit data as an individual source to be used in combination, apart from Sam Young, was appropriate. Commerce, for the purpose of calculating a facts available capped profit rate, rejected Samyang's financial statement as a data source because of "the predominance of Samyang's export sales" and the inability to "rule out the possibility that its U.S. sales exceeded its home market sales," and that "in any case, home market sales are less than export sales." Second Redetermination at 9. Commerce does not address Petitioners' contention that the record contains profit data corresponding to Samyang's home market sales alone. Pet. Br at 5 (citing Memo to Case File from Suresh Maniam regarding "Calculations for the Preliminary Determination of Samyang Corporation" (October 29, 1999), Domestic Industry's App. Tab 12 (calculating Samyang's weighted-average dumping margin based on a comparison of its POI export price sales with its POI average normal value, "which is based on Samyang's comparable sales in the home market")). The separate CV calculation, however, attached to the memo does not indicate it is based on the home market profit rates. Further, because neither party argues that Commerce could have or should have calculated Geum Poong's CV profit rate by combining profit rates for Samyang, Saehan and SK Chemicals, as the court suggested in Geum Poong II, the court does not reach this issue. The court notes that Geum Poong has stated that, in terms of size and dominance in the Korean PSF industry, Samyang is an equivalent of a "Microsoft" and therefore it opposes using its profit rate for any purpose. See Geum Poong's Objections to Remand Determination (October 22, 2001).

**D.      Alleged Inconsistency with Calculation of CV Selling Expense Ratio**

In the original Final Determination, Commerce calculated a surrogate selling expense ratio for Geum Poong under Alternative Three that was equal to the "weighted average amounts for selling expenses . . . by Samyang and Sam Young in their respective comparison markets on sales in the ordinary course of trade."   The court in Geum Poong I sustained Commerce's use of facts available in calculating Geum Poong's CV selling expenses.  164 F. Supp. 2d at 676-77.

Petitioners argue that Commerce's selection of the Samyang/Sam Young data as "facts available" for CV selling expense data requires Commerce to rely on the same sources in calculating Geum Poong's CV profit.  Pet. Br. at 8.  Petitioners reason that it must rely on the Samyang/Sam Young data because they stand as a "benchmark" of the reasonableness of surrogate "facts available" financial data.   While Petitioners concede there are situations in which Commerce may rely on different sources of data to determine selling expenses and profits, they maintain that Commerce acted arbitrarily because it failed to state its reasons for using different data sources even though it invoked its "facts available" authority for both determining both surrogate profit and surrogate selling expenses.   Pet. Br. at 9 (citing SKF USA Inc. et al. v. United States, 263 F.3d 1369, 1382 (Fed Cir. 2001) (citing Transactive Corp v. United States, 91 F. 3d 232, 237 (D.C. Cir. 1996)).

The court in Geum Poong I held that there is no statutory requirement or preference that profit and SG&A expenses be drawn from the same source, noting that "[t]he parties point to nothing in the statute or applicable regulation that requires Commerce to use the same set of data sources for calculating selling expenses and profit." 163 F. Supp. 2d at 677 & n.11. The court also noted Commerce's past practice of basing selling expenses on respondent's actual amounts incurred and realized by the respondents in selling in the home market, while calculating CV

profit rate based on financial statements from a producer of the same general category of goods.

See Certain Fresh Cut Flowers from Colombia, 63 Fed. Reg. 31,724, 31,731 (Dep't Comm.

1998) (final admin. rev.).

Petitioners' reliance on SKF USA Inc. is misplaced. There, the court rejected

Commerce's assigning two interpretations of a statutorily defined term for two different purposes

without giving any explanation for doing so. 263 F.3d at 1382 ("Commerce is required to

explain why it uses different definitions of "foreign like product" for price purposes and when

calculating constructed value, and that explanation must be reasonable.") In contrast, Commerce

in this case did not interpret one term differently in two different calculations, but merely

calculated two separate items according to different methodologies.

Accordingly, Commerce's calculation of Geum Poong's CV profit rate is supported and

is in accordance with the statute.

## II. Geum Poong's Motion for Timely Publication of Notice

Geum Poong requests that the court order that Commerce, pursuant to 19 U.S.C. §

1516a(e),[13] publish written notice of the lifting of suspension of entries and revised antidumping

---

[13] Section 1516a(e) reads as follows:

Liquidation in accordance with final decision. If the cause of action is sustained in whole or in part by a decision of the United States Court of International Trade or of the United States Court of Appeals for the Federal Circuit--
  (1) entries of merchandise of the character covered by the published determination of the Secretary, the administering authority, or the Commission, which is entered, or withdrawn from warehouse, for consumption after the date of publication in the Federal Register by the Secretary or the administering authority of a notice of the court decision, and
  (2) entries, the liquidation of which was enjoined under subsection (c)(2),

shall be liquidated in accordance with the final court decision in the action. Such notice of the court decision shall be published within ten days from the date of the issuance of the court decision.

margins within ten days of the date upon which the court's decision becomes final.[14]  Commerce

responds that the Federal Circuit in Fujitsu General America held that "there is no language in §

1516a(e) that attaches a consequence to a failure by Commerce to meet the ten-day publication

requirement."  283 F. 3d at 1379.  Under this standard, Commerce argues, an order compelling

timely publication would be a violation of the ruling because:  (1) it should be presumed that

public officials will comply with the law; and (2) the court does not have the power to rule on

this issue, as no case or controversy currently exists.

The court addressed this issue in Thai Pineapple Canning Indus. Corp. v. United States,

Court No. 98-03-00487, Slip Op. 00-47 (April 27, 2000).  There, the court rejected the plaintiffs'

request that the court order Commerce to instruct Customs to use the correct importer-specific

assessment rates to liquidate entries during one time period, and to apply the recalculated

weighted-average rate to liquidate entries during another time period.   The court reasoned as

follows:

> Because the entries have yet to be liquidated, there is no "actual injury" for the
> court to address, and the court is only empowered to decide live cases or
> controversies. See Verson, a Div. of Allied Prods. Corp. v. United States, 5 F.
> Supp. 2d 963, 966 (Ct. Int'l Trade 1998) (court does not have power "to render an
> advisory opinion on a question simply because [it] may have to face the same
> question in the future") (citation omitted). The court will not presume that
> Commerce will fail to comply with this court's orders, but rather *presumes that
> the entries will be liquidated in accordance with 19 U.S.C. § 1516a(e)*. Therefore
> the court need not issue an order as requested by plaintiffs at this time.

Id. at 4 (emphasis added).  Geum Poong has not given the court any substantial basis for

rebutting the presumption of regularity in administrative action, merely stating in general that

---

[14] The Federal Circuit in Fujitsu General v. United States, 283 F.3d 1364, 1379 (Fed. Cir. 2002) held that "there is not a 'final court decision' in an action that originates in the Court of International Trade and in which there is an appeal to the Federal Circuit until, following the decision of the Federal Circuit, the time for petitioning the Supreme Court for certiorari expires without the filing of a petition."

"the Department has waited in some cases as long as a year after the final decision of the court and in other cases *never* published notice of such decisions."   Geum Poong's Comments at 5. The court declines Geum Poong's invitation to speculate as to whether Commerce will fail to comply with its statutory mandate for publishing the results of its redetermination in this case.  If Commerce does not perform its duties timely, Geum Poong may pursue its remedies at that time.

**CONCLUSION**

Accordingly, Commerce's <u>Final Results of Redetermination Pursuant to Court Remand Order in Geum Poong II</u> is AFFIRMED.  Geum Poong's motion for an order instructing Commerce to publish its decision and notify Customs of the lifting of the suspension of liquidation is DENIED.

_____

Jane A. Restani

Judge

DATED:  New York, New York

This 22nd day of August, 2002.