Slip Op. 07-25

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____

|  |  |  |
|---|---|---|
| AGRO DUTCH INDUSTRIES LIMITED, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | **Before: MUSGRAVE, Judge** |
| | : | |
| Defendant, | : | Court. No. 02-00499 |
| | : | |
| and | : | |
| | : | |
| COALITION FOR FAIR PRESERVED | : | |
| MUSHROOM TRADE, | : | |
| | : | |
| Defendant-Intervenor. | : | |
_____ :

### OPINION AND ORDER

[Plaintiff argued that agency's antidumping duty determinations were not proper in that: (1) the agency's use of partial facts available and adverse inferences for certain transactions was in error; (2) that agency's determination of plaintiff's constructed value was in error; and (3) that agency's adjustment of plaintiff's imputed credit expenses was in error.  The court found: (1) agency's reasoning as to use of partial facts available and adverse inferences was not clear and remanded that matter for further consideration; (2) agency's determinations as to plaintiff's constructed value calculation was proper; and (3) agency's determination as to plaintiff's imputed credit expenses was proper.]

Dated: February 16, 2007

*Garvey Schubert Barer* (*Lizbeth R. Levinson*, *John C. Kalitka*, and *Ronald M. Wisla*) for the plaintiff.

*Robert D. McCallum*, Assistant Attorney General, Civil Division, United States Department of Justice, *Jeanne Davidson*, Acting Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Stefan Shaibani*, and *Delfa Castillo*); International Office of Chief Counsel for Import Administration, United States Department of Commerce (*William G. Isasi*), of counsel, for the defendant.

*Collier, Shannon, Scott, PLLC* (*Adam H. Gordon* and *Michael J. Coursey*) for the defendant-intervenor.

Before the court is plaintiff Agro Dutch Industries, Limited's ("plaintiff," "Agro Dutch," or "respondent") motion for judgment on the agency record. Plaintiff challenges aspects of the United States Department of Commerce's ("defendant," "Commerce," or "Department") determinations made for the Second Administrative Review of the antidumping duty order covering certain preserved mushrooms from India. *See* Certain Preserved Mushrooms From India: Final Results of Antidumping Duty Admin. Review, 67 Fed. Reg. 46,172 (ITA July 12, 2002) ("Final Results"); *see id.* at 14,173 (adopting reasoning of the Issues and Decision Memo. for [the] Final Results of the Antidumping Duty Admin. Review on Certain Preserved Mushroom [sic] from India - February 1, 2000, through January 31, 2001, Pub. R. Doc. 154 ("Decision Memo")). By its motion plaintiff raises three main issues: (1) that the use of partial facts available and adverse inferences for certain of plaintiff's sales was improper; (2) that the methodology used to determine plaintiff's constructed value was in error; and (3) that the calculation of plaintiff's imputed credit expenses was in error.[1]

### Jurisdiction and Standard of Review

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (2000). The court must uphold Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with the law . . . ." 19 U.S.C. § 1516a(b)(1)(B) (2000). Substantial evidence is "more than a mere scintilla, it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United*

---

[1]      Plaintiff also alleges that Commerce issued improper liquidation instructions. As this matter is being remanded, the court does not reach this issue at this time.

*States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938), and *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)). This standard requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619–20 (1966)). However, substantial evidence supporting an agency determination must be based on the whole record, and a reviewing court must take into account not only that which supports the agency's conclusion, but also "whatever in the record fairly detracts from its weight." *Melex USA, Inc. v. United States*, 19 CIT 1130, 1132, 899 F. Supp. 632, 635 (1995) (citing *Universal Camera*, 340 U.S. at 488).

## *Background*

Commerce published a notice in the Federal Register alerting interested parties that they could request an administrative review of the antidumping duty order covering the subject merchandise for the period of review of February 2000 through January 2001 ("POR"). *See* Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opp'y to Req. Admin. Review, 66 Fed. Reg. 10,269, 10,269 (ITA Feb. 14, 2001). Plaintiff requested review of its antidumping duty margin, Commerce initiated a review thereof, and Commerce sent plaintiff an antidumping questionnaire. *See* letter from law firm of Manatt, Phelps & Phillips LLP ("MPP") to Commerce of 2/26/01, Pub. R. Doc. 3; Initiation of Antidumping and Countervailing Duty Admin. Reviews and Reqs. for Revocations in Part, 66 Fed. Reg. 16,037, 16,038 (ITA Mar. 22, 2001); letter from Commerce to MPP of 3/30/01, Pub. R. Doc. 9, Attach. ("Questionnaire").

Plaintiff timely submitted responses to the Questionnaire. *See* letter from MPP to Commerce of 5/7/01, Conf. R. Doc. 3, Attach. ("Section A Response"); letter from MPP to Commerce of 5/25/01, Conf. R. Doc. 7, Attach. ("Section C Response"). In its responses, plaintiff answered various questions about its sales and sales processes. Of relevance to this discussion, plaintiff averred that each of its sales were individually negotiated, and indicated that once terms were agreed to, they were firm. *See* Section A Resp. at 10 ("We negotiate product, price and quantity with our customer via the telephone. Once we agree to terms, the price and quantity do not change. . . . Our payment terms are 90 days after shipment."); *id*. at 11; *id*. at 12 ("Both our customer and we [sic] are bound to the order price regardless of the change in market prices that occur between [the] order date and shipment date."); *id*. ("All of our sales are made as described . . . above"); *see also* Section C Resp. at C-12 ("All of our sales are made [with] payment terms of 90 days after bill of lading date . . . . We have recorded a '3' in this field [("PAYTERMU")] to indicate this payment term."); Section C Resp., App.[2] ("Sales Database") (showing a "3" entered in the PAYTERMU field for every transaction). Plaintiff further stated that, for all of its transactions, it invoiced its customers several days after the date of shipment, and considered the date of invoice to be the date of sale. *See* Section A Resp. at 10 ("We invoice our customer within a few days after shipment."); *id*. at 12 ("[W]e invoice our customer approximately two to five days after shipment. There are no circumstances under which we would deviate from this practice."); Section C Resp. at C-10 ("The

---

[2]     This document is a printout of all the data entered for plaintiff's sales. It can be found as part of the Section C Response immediately *post* Appendix C-3b.

date of sale is our date of invoice."[3]); Sales Database at "SALINTU" column (showing all transactions have an entered date of sale). Finally, plaintiff stated that it did "not have a written sales contract with [its] customers." Section A Resp. at 11.

After an initial review of the Responses, Commerce requested additional information from plaintiff. *See* letter from Commerce to MPP of 8/9/01, Pub. R. Doc. 80, Attach. ("August 9 Questionnaire"). By this questionnaire, Commerce specifically requested that plaintiff clarify whether there existed "any sales agreement or contract . . . between Agro Dutch and it U.S. customers," and "whether or not Agro Dutch and its U.S. customers have any long-term or multi-purchase contracts or agreements." *Id*. at 1. In response, plaintiff stated that it did not have "any binding contracts or agreements with any U.S. customers during the POR. The quantities and prices of all sales are subject to change until the date of shipment." Letter from MPP to Commerce of 8/30/01, Conf. R. Doc. 20, Attach. ("August 30 Response") at 1.

After reviewing plaintiff's responses, the Coalition for Fair Preserved Mushroom Trade ("Coalition" or "intervenor") raised questions about certain information contained therein. Specifically, the Coalition noted that, while plaintiff had stated in its Section A and C Responses that all of its sales had terms that required payment ninety days after invoicing, some of plaintiff's transactions had "negative credit periods"—meaning that the entered payment date for a transaction predated the entered sale date for that transaction ("NCP Transactions"). *See* letter from law firm of Collier, Shannon, Scott, PLLC ("CSS") to Commerce of 1/30/02, Conf. R. Doc. 30 ("Coalition's Comments") at 5; *see also* Sales Database at obss. 79, 201, 209 (showing transactions with entered

---

[3]    For clarity, the court will refer to the date of sale/invoice as the date of sale.

payment dates that predate entered sales dates). The Coalition speculated that these values might have been entered in error as plaintiff had nowhere indicated in any of its responses that it had made "prepayment" sales. Coalition's Comments at 6. In response, plaintiff stated that the entered payment dates for the NCP Transactions were, in fact, correct. *See* letter from law firm of Arnold & Porter ("AP") to Commerce of 2/11/02, Conf. R. Doc. 34 ("Reply to Comments") at 2. Plaintiff stated that the data reflected "cash advances" from one of its U.S. customers ("Customer A"[4]) that "were paid in anticipation of future shipments for which the customer, product and price were not determined at the time of the advance" ("The Arrangement"). *Id.*

Commerce then published the preliminary results of its review. *See* Certain Preserved Mushrooms from India: Prelim. Results of Antidumping Duty Admin. Review, 67 Fed. Reg. 10,371 (ITA Mar. 7, 2002) ("Preliminary Results"). For the preliminary calculation of plaintiff's antidumping margin, Commerce determined that it could not use the data related to the NCP Transactions. Commerce explained that this was so because: (1) plaintiff's responses in the Reply to Comments "suggest[] that Agro Dutch may have a long-term contract or sales agreement with [Customer A], yet Agro Dutch claims that it had no binding contracts or agreements with any U.S. customers during the POR," *id.* at 10,374 (citing Aug. 30 Resp. at 1); and (2) "Agro Dutch's reporting of pre-payments appears inconsistent with its earlier statement that all of its U.S. sales are sold with payment terms of 90 days after the bill of lading date." *Id.* (citing Section C Resp. at C-12). Commerce concluded that it would use facts available—and not the entered data for the NCP Transactions—to calculate plaintiff's preliminary antidumping margin because plaintiff's

---

[4]        Customer A is identified in Conf. R. Doc. 34 at 2.

"description of its sales to this customer requires further explanation as to the existence of any sales agreement with this customer, the appropriate date of sale, and the relevant payment terms." *Id*. (citing 19 U.S.C. § 1677e(a)). Commerce further determined that it was necessary to use adverse inferences when selecting among the facts available because plaintiff had "not cooperated to the best of its ability to comply with the Department's requests in the questionnaire and supplemental questionnaire to supply full information of its payment terms and copies of any sales agreements." *Id*. (citing 19 U.S.C. § 1677e(b)). As a result of these determinations, Commerce calculated plaintiff's preliminary antidumping duty margin to be 1.54 percent. *Id*. at 10,376. In calculating plaintiff's preliminary antidumping duty margin, no issues were raised as to the data related to plaintiff's other sales to Customer A ("the POR Transactions") and Commerce included that data in calculating plaintiff's preliminary antidumping margin. Finally, Commerce stated that it would "provide Agro Dutch with the opportunity to provide further information on this topic after the issuance of the preliminary results for consideration in the final results." *Id*. at 10,374.

After the Preliminary Results were published, Commerce sent plaintiff another supplemental questionnaire. *See* letter from Commere to AP of 3/7/02, Pub. R. Doc. 129, Attach. ("March 7 Questionnaire"). Commerce requested that plaintiff:

> Explain in detail the sales and payment terms for transactions involving payment advances, as identified on page 2 of the [Reply to Comments]. In particular:
>
> > a. Specify whether or not *any* type of written sales agreement or contract exists with regard to [Customer A]. If so, provide the document(s). Explain why the agreements were not provided earlier in response to the Department's questionnaire and supplemental questionnaire.

> b.  Explain the apparent contradiction between the description of payment terms to [Customer A] in the [Reply to Comments], and the statement at page C-12 of the [Section C Response] that all of Agro Dutch's U.S. sales are made with payment terms of 90 days after the bill of lading date.

*Id*. at 1 (emphasis in original).  Plaintiff timely responded to this supplemental questionnaire.  *See* letter from AP to Commerce of 3/26/02, Conf. R. Doc. 47, Attach. ("March 26 Response").  In response to Commerce's question to "[e]xplain in detail the sales and payment terms," plaintiff stated that

> [Customer A] is both a customer of ADIL and a sales agent. That is it both purchases ADIL mushrooms for its own account, and also serves as a sales agent for ADIL sales to other customers. [Customer A] earns a commission from ADIL for certain sales for which it acts as an agent.

> [Customer A] asked us to produce a product for shipment during the POI that we were not then producing — A-1 mushrooms, which are Grade A mushrooms that are sliced 3/8" [sic] thick rather than the standard 3/16" [sic] thick.  We understand that [Customer A sells this product to a U.S. buyer].  ADIL was concerned that if it began producing this product, and [Customer A] were to cancel an order, ADIL would not be able to resell this customized product . . . . To satisfy this concern, and provide assurance that it would complete all purchases, [Customer A] provided advance payment deposits . . . , in effect as security for future sales of a new product.

> There is no written agreement, only an oral understanding. Moreover, the advances were provided without regard to definite future sales.  Indeed the whole idea of the advance was to provide a form of security against future orders.  There was no corresponding contemporaneous agreement to ship specific quantities to specific customers at specific prices.

> As we began shipping A-1 mushrooms, and they were accepted by the ultimate customer, [Customer A] sought the quick return of its advance payments.  We agreed to credit the deposits

> against sales of other products as well as A-1 mushrooms. In addition, we agreed to credit the advance payments against sales to other customers who would agree to pay the invoiced amounts to [Customer A] rather than to us. This enabled [Customer A] to recover its advance payments earlier. The invoices at issue note that the sale was made against advance payment, and where [Customer A] was not the customer, it is shown as the consignee. For these sales, [Customer A] collected payment from the ultimate customer.

*Id*. at 1–2 (citation omitted); *see id.* at Ex. 5 (sample invoice listing Customer A as consignee). In response to Commerce's question as to whether there was or was not a "written sales agreement or contract" between plaintiff and Customer A, plaintiff stated that "[n]o written sales agreement or contract between ADIL and any customer, including [Customer A] of any type was in effect during the POR or regarding sales made during the POR." *Id.* at 2. Finally, in response to Commerce's question that plaintiff "explain the apparent contradiction" of its claim that all of its sales were made with ninety-day payment terms and the data on the record showing that not all sales were made in this manner, plaintiff stated that

> ADIL's standard payment terms are 90 days after bill of lading date, and these terms applied to all customers during the POR. With respect to the advance payments made by [Customer A], obviously the customer paid in advance and thus did not have 90 days to pay. For those sales to which the advance payments were applied, it would have been more accurate to state that the terms of payment were payment in advance.

*Id*. Thereafter, Commerce published the Final Results.

For the Final Results, Commerce continued to find that the use of facts available and adverse inferences was warranted for the NCP Transactions. *See* Decision Memo at 7–10 ("Comment 2"). Unlike the Preliminary Results, however, for the Final Results Commerce found that the use of facts available and adverse inferences was warranted for *all* of plaintiff's sales to Customer A—including

the POR Transactions.  *See id*. at 8–9; *see also* Agro Dutch Final Results Margin Calculation

Program Log and Output, Conf. R. Doc. 54 at ll. 335–340 (stating that the "[f]ollowing programing

to apply AFA rate to *all sales* to [Customer A], per discussion in Decision Memo, Comment 2 . . . ."

(emphasis added)).  In Comment 2, Commerce explained why use of facts available was warranted

for all of these transactions:

> [D]espite specific requests from the Department to Agro Dutch in the instant review to provide documentation and information concerning this specific sales channel, Agro Dutch failed to provide this information until the post-preliminary results March 26, 2002, submission.  In this review, Agro Dutch first reported that all of its U.S. sales are sold with payment terms of 90 days after the bill of lading date (*see* May 25, 2001, Section C questionnaire response at page C-12).  It also asserted that it had no binding contracts or sales agreements with any U.S. customers during the POR (*see* August 30, 2001, supplemental questionnaire response at page 1[)].  Nowhere in the May 7, 2001, Section A response discussion on sales process or any other response does Agro Dutch refer to advance payment sales circumstances involving [Customer A].  Not until the Department sought clarification of Agro Dutch's reported payments, shortly before the due date of the preliminary results, did Agro Dutch first mention these unusual sales circumstances (*see* February 11, 2002, response at page 2).  Only after the preliminary results of this review and another supplemental questionnaire did Agro Dutch provide any details about sales to the customer in question in the March 26, 2002, submission (in full, ten months after the Department first requested Agro Dutch's sales information in its initial questionnaire).
>
> However, this belated explanation raises more questions than it answers.  Agro Dutch's March 26, 2002, explanation indicates that the customer provided a great deal of money to Agro Dutch merely as a deposit against future orders for which no written agreement or contract was required, nor any guarantees on pricing.  To advance such a large amount of money without any further legal commitment or security reflects an unusual business agreement that requires further explanation.  If no sales agreement or contract exists beyond an "oral understanding" (*see* the March 16, 2002, submission at page 1), then such a deal implies either a great deal of trust on the part of

the customer, or that the customer has some other form of relationship to Agro Dutch.

Not only is the appropriate date of sale and payment date in question, but also other key sales issues, such as the role of the customer as a sales and payment agent, the relationship of the customer to Agro Dutch, and even the price basis for the sales (*i.e.*, Agro Dutch's price to the customer in question, or price that the other customers paid this customer, as noted at page 1 of the March 26, 2002, response). The petitioners suggested in their case brief that sales through this customer may be considered more appropriately as constructed export price sales, rather than EP sales. While the record information does not support this conclusion, we cannot entirely rule out this possibility, given the questions that remain about this sales channel. There is a great deal more to be learned about these sales, but no further opportunity in this proceeding to obtain the information because Agro Dutch failed to provide this sales information until late in the proceeding. Because Agro Dutch withheld information requested by the Department related to these sales . . . , we have determined that facts available is warranted in this instance.

Comment 2 at 8–9 (citing 19 U.S.C. § 1677e(a)(2)(A)). Furthermore, Commerce determined that

the use of adverse inferences was warranted for all of plaintiff's transactions with Customer A.

Commerce explained that

the Department's lack of full knowledge about the sales involving this customer, as well as those sales where the customer acted as a payment agent, stems directly from Agro Dutch's lack of cooperation in providing specifically requested information in this review. This information was maintained in Agro Dutch's records and was within its control, but Agro Dutch failed to provide the information in its questionnaire response. Thus, Agro Dutch has not cooperated with respect to providing this information and an adverse inference is warranted in applying facts available for the sales made to the customer in question . . . .

*Id*. at 9 (citing 19 U.S.C. § 1677e(b)). Using facts available and adverse inferences for both the NCP

and POR Transactions, Commerce calculated plaintiff's final antidumping duty margin to be 27.80

percent.

*Discussion*

I

The court first examines plaintiff's contention that Commerce's use of partial facts available

and adverse inferences was not proper.  Commerce may use facts available in calculating an

antidumping duty margin.  The statute provides, in relevant part:

(a) In general.  If– . . .

> (2) an interested party or any other person–

>> (A) withholds information that has been requested
>> by the administering authority . . . under this title, . . .

> the administering authority . . . shall, subject to section 782(d), use
> the facts otherwise available in reaching the applicable determination
> under this title.

19 U.S.C. § 1677e(a)(2)(A) (2000).  Section 782(d) (19 U.S.C. § 1677m(d)) provides:

> If the administering authority . . . determines that a response to a
> request for information under this title does not comply with the
> request, the administering authority . . . shall promptly inform the
> person submitting the response of the nature of the deficiency and
> shall, to the extent practicable, provide that person with an
> opportunity to remedy or explain the deficiency in light of the time
> limits established for the completion of investigations or reviews
> under this title.  If that person submits further information in response
> to such deficiency and either–

>> (1) the administering authority . . . finds that such
>> response is not satisfactory, or

>> (2) such response is not submitted within the
>> applicable time limits,

> then the administering authority . . . may, subject to subsection (e),
> disregard all or part of the original and subsequent responses.

19 U.S.C. § 1677m(d) (2000). Section 782(e) (19 U.S.C. § 1677m(e)) provides:

> In reaching a determination . . . the administering authority . . . shall
> not decline to consider information that is submitted by an interested
> party and is necessary to the determination but does not meet all the
> applicable requirements established by the administering authority or
> the Commission, if–
>
>> (1) the information is submitted by the deadline
>> established for its submission,
>>
>> (2) the information can be verified,
>>
>> (3) the information is not so incomplete that it cannot
>> serve as a reliable basis for reaching the applicable
>> determination,
>>
>> (4) the interested party has demonstrated that it acted
>> to the best of its ability in providing the information
>> and meeting the requirements established by the
>> administering authority . . . with respect to the
>> information, and
>>
>> (5) the information can be used without undue
>> difficulties.

19 U.S.C. § 1677m(e). Here, the court understands that there are three distinct components to

Commerce's facts available and adverse inferences determinations: The Arrangement, The NCP

Transactions, and the POR Transactions. The difficulty in reviewing Commerce's determinations

with respect to these distinct factual situations is that it is not entirely clear how Commerce arrived

at its conclusions. *Nucor Corp. v. United States*, 414 F.3d 1331, 1339 (Fed. Cir. 2005) ("Where an

agency has not made a particular determination explicitly, the agency's ruling nonetheless may be

sustained as long as 'the path of the agency may be reasonably discerned.'" (citing *Ceramica*

*Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987))); *Hynix Semiconductor Inc. v. United States*, 30 CIT __, __, 425 F. Supp. 2d 1287, 1307 (2006) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).  Here, the court cannot uphold Commerce's determinations with regard to the use of partial facts available and adverse inferences for several reasons.

First, Commerce's reasoning as to the use of facts available and adverse inferences for The Arrangement cannot be "reasonably discerned."  For example, The Arrangement is variously characterized as being for "cash advances" or "security for future sales" or "advance payments."  *See* Reply to Comments at 2; March 26 Response at 1–2; Preliminary Results at 10,374.  The proper characterization of The Arrangement would seem vital to Commerce's determination, but Commerce never fully resolves this important issue or explains why such resolution is unnecessary to its determination.  Furthermore, Commerce's determination as to The Arrangement is not clear because the analyses for The Arrangement, the NCP Transactions and the POR Transactions are intertwined.  For instance, Commerce seems to find that, because the use of facts available might be warranted for The Arrangement, that—in and of itself—is sufficient reason to find the use of facts available was warranted for the NCP and POR Transactions.  *See* Decision Memo at 8–9.  This cannot be, however, because the NCP and POR transactions, while possibly related in some way to The Arrangement, are distinct factual situations that require separate analyses.  While the court appreciates that Commerce has provided some analysis of this complex situation, due to that complexity, a clear and distinct recitation of Commerce's reasoning is necessary to facilitate the

proper review of Commerce's determination as to The Arrangement.[5]

Second, Commerce's reasoning as to the use of facts available and adverse inferences for the NCP Transactions cannot be "reasonably discerned." A review of the record shows that the only reason provided for using facts available for the NCP Transactions was that plaintiff "withheld" sales and payment data. *See* Comment 2 at 9 (citing 19 U.S.C. § 1677e(a)(2)(A)). The data contained in plaintiff's responses, however, seems to contradict this conclusion. Specifically, plaintiff did enter a sale date for every one of its transactions—including the NCP Transactions—and those values do not seem aberrational. *See* Sales Database at SALEINTU column. Thus, it is not clear how plaintiff "withheld" this information. Furthermore, while the record seems to show that there are unexpected data points in the PAYDATEU field for the NCP Transactions, it also appears that the amount of money "assigned" to Customer A for these transactions is not necessarily aberrational, in that the payment amounts for similar transactions seem equivalent. *Compare* Sales Database obs. 78 *with* obs. 79 (same merchandise/buyer). This being so, it is not clear how these transactions differ fundamentally from those that Commerce was able to use to calculate plaintiff's antidumping margin.[6] Indeed, Commerce nowhere explains in detail—with reference to its statutory

---

[5]      The fact that Commerce's analysis cannot be "reasonably discerned" is reflected in the parties' submissions, which do not provide separate analyses for The Arrangement, the NCP Transactions, or the POR Transactions. *See generally* Pl.'s Resp. at 9–16, Def.'s Resp. at 10–19. Indeed, only intervenor mentions the NCP and POR Transactions—and then only in passing. *See* Intervenor's Resp. at 29, 30.

[6]      To put it a slightly different way: "but for" the apparent random assignment of the payments for the NCP Transactions to Customer A, it seems beyond doubt that those transactions would have had entered payment dates that conformed to plaintiff's Section A and C Responses. Were that the case, it would be logical that Commerce would have used that data to calculate plaintiff's antidumping duty margin.

mandate—how this data is "missing" such that the court can now conclude that the use of facts available and adverse inferences was proper for the NCP Transactions. *See* 19 U.S.C. §§ 1677m(d), (e); *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382–83 (Fed. Cir. 2003) (discussing use of facts available and adverse inferences).

Finally, Commerce's reasoning as to the use of fact available and adverse inferences for the POR Transactions cannot be "reasonably discerned." Again, the only reason given for resorting to facts available for the POR Transactions is that plaintiff "withheld" sale and payment date data for them. *See* Comment 2 at 9 (citing 19 U.S.C. § 1677e(a)(2)(A)). As with the NCP Transactions, however, plaintiff did enter sales dates for each of these transactions. *See* Sales Database at SALEINTU column. Furthermore, plaintiff entered payment dates for these transactions that appear to conform to plaintiff's Sections A and C Responses. *See id.* at PAYDATEU column. Indeed, it is entirely unclear how this data is "missing," as Commerce was able to use it to calculate plaintiff's preliminary antidumping duty margin. *See* Preliminary Results, 67 Fed. Reg. at 10,374. Therefore, the court is unable to conclude that Commerce's use of facts available and adverse inferences for the POR Transactions was proper. *See* 19 U.S.C. §§ 1677m(d), (e); *Nippon*, 337 F.3d at 1382–83.

For the above reasons, the court cannot find that Commerce's determination that use of partial facts available and adverse inferences was warranted for The Arrangement, the NCP Transactions, or the POR Transactions was proper. On remand, Commerce shall provide separate analyses for The Arrangement, the NCP Transactions, and the POR Transactions and clearly state how each of its determinations are in accordance with its statutory mandate and cite to specific record evidence in support thereof.

II

Plaintiff next contends that Commerce's determination as to constructed value was not

proper.  Plaintiff raises two arguments in this regard: (1) that Commerce's selection of plaintiff's

profit rate from the immediately preceding review was not in accordance with law; and (2) that

Commerce did not properly apply the statutory profit cap.  The court turns to each contention in turn.

A

For the Final Results, Commerce determined that it was necessary to use constructed value

to calculate plaintiff's antidumping duty margin.  *See* Decision Memo at 3–6 ("Comment 1").

Commerce determined that was so because plaintiff had neither home-market nor third-country sales

during the period of review upon which to base normal value.  *See* Comment 1 at 3 (citing 19 U.S.C.

§ 1677b(a)(4)).  Thus, Commerce looked to other sources to derive a profit rate and selling expenses

for constructed value.  *See id*. (citing 19 U.S.C. § 1677b(e)).  Specifically, Commerce had to

determine constructed value in accordance with one of the three statutory alternatives provided by

19 U.S.C. § 1677b(e)(2)(B).  The statute provides, in relevant part:

> (e) Constructed value. For purposes of this title, the constructed value of imported
> merchandise shall be an amount equal to the sum of-- . . .
>
>> (2) (A) the actual amounts incurred and realized by the specific
>> exporter or producer . . . , or
>>
>> (B) if actual data are not available with respect to the amounts
>> described in subparagraph (A), then--
>>
>>> (i) the actual amounts incurred and realized by the
>>> specific exporter or producer being examined in the
>>> investigation or review for selling, general, and
>>> administrative expenses, and for profits, in connection
>>> with the production and sale, for consumption in the

> foreign country, of merchandise that is in the same general category of products as the subject merchandise,
>
> (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or
>
> (iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise . . . .

19 U.S.C. § 1677b(e) (2000). Due to issues related to the possible revelation of proprietary data, Commerce determined that it could not use the first two statutory alternatives and, so, turned to the third ("Alternative 3")[7]. Commerce noted that, when it had used Alternative 3 in the past, it weighed various factors to select the proper data. *See* Comment 1 at 4 (citing Notice of Final Determination of Sales at Less Than Fair Value: Pure Magnesium from Isr., 66 Fed. Reg. 49,349 (ITA Sep. 27, 2001)). Commerce explained that

> in *Magnesium from Israel*, where the Department also applied Alternative 3 in determining the profit rate, the Department selected the most appropriate profit rate based on several factors, including: (1) the similarity of the potential surrogate companies' business

---

[7]     No party disagrees with Commerce's selection of Alternative 3.

operations and products to the respondent's; (2) the extent to which the financial data of the surrogate company reflects sales in the United States as well as the home market; and (3) the contemporaneity of the surrogate data to the period of investigation or review. In that proceeding, the Department selected a profit rate derived from the 2000 financial data of an Israeli company that was found to have the most similar production process to the respondent. The other financial data available in that investigation was from 1999 and less contemporaneous with the period of investigation.

*Id.* Using this test, Commerce determined that it would use plaintiff's own data for the constructed

value calculation. *Id.* In support, Commerce stated that

[a]pplying the same criteria to this review does not change our profit rate selection [from the Preliminary Results]. The use of the respondent's own data obviously best satisfies the first factor. The Agro Dutch . . . rate[] also [is] based on sales to the comparison market and not on U.S. sales. As for contemporaneity, the third factor, we note that the profit rate experience from the 1998--2000 review period reflects the time period immediately prior to the instant review. There is no information on the record to suggest that the profit rate experience from that period is so different from the instant period to render those profit rates distortive. Moreover, the specificity of Agro Dutch's . . . own financial data outweighs the contemporaneity of Himalya's financial data in selecting the most appropriate profit rates. We disagree with the petitioners that the Himalya POR rate can be averaged with Agro Dutch's . . . 1998--2000 profit rate without the possibility of disclosing Himalya's proprietary information to Agro Dutch . . . . Further, averaging Himalya's POR data with each of the other respondents' own 1998--2000 data does not necessarily make the resulting average rate a more appropriate rate. There is no information on the record to indicate that the difference between the respondent's 1998--2000 data and Himalya's POR rate is due to contemporaneity rather than differences in business operations and products.

*Id.* at 5–6.

Plaintiff contends that Commerce's selection of plaintiff's own data was not proper.

Specifically, plaintiff argues that, when using Alternative 3, Commerce is constrained to use home

market data where such data is available. *See* Pl.'s Mem. at 19 (citing Issues and Decision Memo. for the 1999–2000 Antidumping Admin. Review: Fresh Salmon from Chile, (Aug. 6, 2001)). Plaintiff argues that this "preference" is shown by the phrase "for consumption in the foreign country" appearing in each of the three relevant subsections. *Id.* at 19; *see* 19 U.S.C. §§ 1677b(2)(B)(i)–(iii). Plaintiff claims that, rather than using the selected data, Commerce "should have used home market profit from the first period of review, not third county profit from the first period of review . . . ." *Id.* at 21.

The court does not agree that the statute contains such a "preference" or that Commerce was required to use home market profit data when using Alternative 3. This is so because this Court has visited this issue and found that Alternative 3 does not contain a general "preference" for home market data. *See Geum Poong Corp. v. United States*, 25 CIT 1089, 1093, 163 F. Supp. 2d 669, 675–76 (2001). In *Geum Poong*, the Court considered whether Commerce, using Alternative 3, was limited to using available home market selling expense data—as opposed to available third country selling expense data. *Id.* The Court found that Commerce was not so constrained, stating that the phrase "for consumption in the foreign country" applied only to the "profit cap" language of Alternative 3, and not the entire subsection. *See id.* at 1093, 163 F. Supp. 2d at 675. The Court continued that "Commerce properly calculated selling expenses according to 'any reasonable method' without limitation as to whether the underlying data had been derived from home market or non-home market sales." *Id.* at 1094–95, 163 F. Supp. 2d at 677. Here, Commerce, using Alternative 3, was faced with a comparable situation, in that it is selecting between home market profit rates and third country profit rates. Because Alternative 3 does not evince a "preference" for

home market data (even though such data might exist) Commerce was free to use "any reasonable method" to determine plaintiff's constructed value. *Id*. Indeed, Commerce provided an explanation as to why it was using this data as opposed to other, available, home-market data. Thus, the court finds that Commerce's determination to use plaintiff's own third country profit data for plaintiff's constructed value calculation was proper.

B

For the Final Results Commerce applied the statutory "profit cap" when calculating plaintiff's antidumping duty margin. To determine the profit cap Commerce considered information from several sources: (1) data from another respondent in the instant investigation; (2) data from two respondents from the immediately preceding administrative review; and (3) data from the period of review for several food companies that did not produce the subject merchandise. *See* Comment 1 at 6[8]. After considering these various sources, Commerce selected the profit rates of the three mushroom producers/exporters to determine the profit cap. *Id*. In support of its determination Commerce explained that

> the three preserved mushroom exporter/producer profit rates meet the statutory requirement because the rates reflect the profit normally realized by exporters or producers in connection with the sale, for consumption in India of preserved mushrooms, which, as the subject merchandise, fall within the definition of the same general category of products as the subject merchandise. The statute does not specify the contemporaneity of the data, and we consider the information from the immediately prior review to be sufficiently contemporaneous for this purpose because there is no information on the record to the contrary (*i.e.*, no reason to believe the profit rates are significantly different in this POR than the last).

---

[8]     The companies' products included dried and processed fruits, spices, vegetable products, charcoal, and soft drinks. Pl.'s Mem. at 22.

> We are not using the profit rates derived from the [non-subject merchandise producing companies'] financial statements in determining the profit cap because their data is less relevant than that of the reviewed companies. . . .

*Id.* Using this data, Commerce "compared the 1998-2000 profit rate[] for Agro Dutch . . . to the profit cap. [This rate did not] exceeded the profit cap (*i.e.*, the highest profit rate among those included in the profit cap determination) under Alternative 3." *Id.* at 6 (citing Constructed Value Profit Rate Cap Comparison, Conf. R. Doc. 52).

Plaintiff argues that Commerce improperly applied the profit cap. Plaintiff contends that it was improper for Commerce to select "the highest individual profit rate achieved by producers of subject mushrooms on sales in India during the past two periods of review." Pl.'s Mem. at 22 (emphasis removed). Plaintiff continues that "such an approach is inconsistent with the statute's requirement that the Department use as the profit cap the amount 'normally realized.' Stated simply, the highest individual profit rate is not the amount 'normally realized.'" Pl.'s Mem. at 22. Plaintiff argues that, instead, Commerce should have used profit data that it placed on the record "for other Indian food products companies," as this data closely corresponded with the fiscal year of the period of review. Pl.'s Mem. at 22. Plaintiff states that "[t]hese food processing companies all produce processed food products . . . ." *Id.*

In essence, plaintiff raises two issues. The first is whether Commerce had the discretion to select from among the various data on the record for the profit cap; the second is whether, after selecting that data, Commerce properly used that information to determine a profit cap. As to the first issue, as previously discussed, when using Alternative 3 Commerce may use "any reasonable method" in order to determine constructed value. *See* 19 U.S.C. 1677b(e)(2)(iii); *Geum Poong*, 25

CIT at 1093, 163 F. Supp. 2d at 675–76.  The only limitation placed on Commerce's determination of constructed value is that, unless unusual circumstances warrant, it must apply a profit cap that is based on home market sales.  *See* 19 U.S.C. 1677b(e)(2)(iii); *Geum Poong*, at 1093, 163 F. Supp. 2d at 675.  Here, the court cannot say, given that Commerce may use "any reasonable method," that it was improper for Commerce to reject home market data that it considered "less relevant" in favor of other data.  Indeed, plaintiff makes no argument to the contrary.  *See* Pl.'s Mem. at 16–21; Pl.'s Reply at 6–7.

As to the second issue—whether Commerce properly used the data it selected for determining the profit rate—plaintiff argues that Commerce should have used a profit cap that was an average of available rates.  *See* Pl.'s Mem. at 23 (citing *Floral Trade Council v. United States*, 41 F. Supp. 2d 319, 332 (1999); Magnesium from Isr., 66 Fed. Reg. 49,349 (Comment 8)); Pl.'s Reply at 7 ("Even if the Court [sic] uses the profit rates of [the] three mushroom companies rather than the profit rates of the four fruit and vegetable companies, the Department should use the average rates from the companies selected, not the highest rate.").  Again, there is nothing in the language of the statute that requires Commerce to average rates when determining the profit cap under Alternative 3.  *See* 19 U.S.C. § 1677b(e)(2)(iii); *compare id. with* 19 U.S.C. § 1677b(e)(2)(ii) (providing that constructed value be based on "the weighted average of the actual amounts incurred and realized by exporters or producers . . . .").  Indeed, one of plaintiff's cited sources undermines its position that it is Commerce's "normal practice" to average rates.  *See* Magnesium from Isr., Comment 8 (stating that "the Department has on the record the financial statements of three surrogate companies *from which to select a reasonable CV profit rate or to calculate an average*

*profit rate* if more than one surrogate's data is equally reasonable." (emphasis added)). This being

so, the court cannot say that it was improper for Commerce to select—in this instance—the "highest"

profit rate for the profit cap.

III

Finally, for the Final Results, Commerce revised plaintiff's imputed credit expense data

because plaintiff deducted commissions from this amount. Commerce explained that it was proper

to do so because,

> [i]n accordance with Department practice, we normally impute credit
> based on the gross price less any price adjustments granted at the time
> of invoicing. As commissions are not considered price adjustments
> for purposes of calculating imputed credit, and there are no other
> adjustments to price at the time of invoicing, we recalculated Agro
> Dutch's imputed credit expense based on the gross price without any
> deductions.

Comment 1 at 2 [9]. Plaintiff argues that Commerce's calculation of its imputed credit expenses was

not in accordance with law. Plaintiff contends—in full—that

> the Department wrongly calculated Agro Dutch's imputed credit
> expense based on the gross sales value, rather than on the gross sales
> value less commissions paid to third parties. Credit expenses are the
> costs of financing accounts receivables. The Department's inclusion
> of commission in calculating imputed credit ignores the fact that
> commissions are not paid by Agro Dutch until it receives payment
> from its customer. In other words, Agro Dutch finances only its net
> sales proceeds, not commissions. As a result, the Department should
> have deducted commissions prior to calculating the credit expense.

---

[9]    The Questionnaire instructions provide guidance as to the meaning of the term
"imputed expenses." *See* Questionnaire at I-9 ("Imputed expenses generally are opportunity costs
(rather than actual costs) that are not reflected in the financial records of the company being
investigated, but which must be estimated and reported for purposes of an antidumping inquiry.
Common examples of imputed expenses include credit expenses and inventory carrying costs.").

Pl.'s Mem. at 23–24. Defendant responds that Commerce's adjustment to plaintiff's imputed credit expenses was proper because it was "[c]onsistent with its standard methodology," and that Commerce includes this expense in the antidumping calculation "to estimate the opportunity cost of money incurred by a company from the time . . . merchandise is shipped from the seller's facility until the seller receives payment for the goods." Def.'s Resp. at 32 (citations omitted). Intervenor responds by presenting two reasons why Commerce's should be found proper. First, intervenor argues that, because plaintiff failed to raise this issue at the administrative level, it is prevented from doing so now due to the doctrine of exhaustion of administrative remedies. *See* Intervenor's Resp. at 47; 28 U.S.C.§ 2637(d) (stating that the court "shall, where appropriate, require the exhaustion of administrative remedies."); *JCM, Ltd. v. United States*, 210 F.3d 1357, 1359 (Fed. Cir. 1999) ("In the antidumping context, Congress has prescribed a clear, step-by-step process for a claimant to follow, and the failure to do so precludes it from obtaining review of that issue in the Court of International Trade." (citing *Sandvik Steel Co. v. United States*, 164 F.3d 596, 599–600 (Fed. Cir. 1998); *National Corn Growers Ass'n v. Baker*, 840 F.2d 1547, 1555–57 (Fed. Cir. 1988))). Second, in an argument that parallels defendant's, intervenor contends that plaintiff's position lacks merit because "[i]mputed credit measures the value of the good sold from the time it is shipped from the seller to the time the buyer makes payment. Imputed credit is based on the gross price of the good between the buyer and seller." Intervenor's Resp. at 50.

Defendant and intervenor's points are well taken. Indeed, plaintiff—beyond merely alleging, in its moving brief, that Commerce's determination was not proper—cites neither statute, regulation, nor case law in support of its position. *See* Pl.'s Mem. at 23–24. Furthermore, plaintiff, in its reply

brief, in no way challenges either defendant's or intervenor's arguments that Commerce was using its "standard methodology," or intervenor's argument that this issue should have been raised at the administrative level. *Id*. As plaintiff neither presses its own argument nor takes issue with those of defendant and intervenor, the court considers plaintiff to have abandoned its position as to Commerce's adjustment of its imputed credit expenses and finds that Commerce's determination in this regard proper.

### *Conclusion*

For the foregoing reasons, the court remands this matter so that Commerce may re-visit its determination that the use of partial facts available and adverse inferences was warranted as to The Arrangement, the NCP Transactions, and the POR Transactions. Commerce shall file the results of this remand within sixty days of the date of this opinion; all parties may submit comments to the remand results within 30 days of filing; and all parties may file responses to any such comments within 10 days after the submission thereof. As to the other issues addressed in this opinion, the court finds that Commerce's determinations are supported by substantial evidence and otherwise in accordance with law.

SO ORDERED

/s/ R. Kenton Musgrave
R. Kenton Musgrave, Judge

Dated: February 16, 2007
          New York, New York